# IN THE SUPREME COURT OF IOWA

No. 05–1994

Filed January 23, 2009

**KIMBERLY S. JASPER**,

     Appellant,

vs.

**H. NIZAM, INC.** d/b/a KID UNIVERSITY and **MOHSIN HUSSAIN,** Individually and in his Corporate Capacity,

     Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Donna L. Paulsen, Judge.

Employer seeks further review in wrongful-discharge action. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

Mark D. Sherinian and Andrew L. LeGrant, West Des Moines, for appellant.

Gordon R. Fischer of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellees.

**CADY, Justice.**

In this appeal, we face several issues of first impression in the continuing development of our tort of wrongful discharge in violation of public policy. Primarily, we must decide whether an administrative regulation may be a source of public policy to restrict the rights of an employer in this state to discharge an at-will employee. We also consider whether a corporate officer may be individually responsible for the tort and address a number of issues relating to damages, including the excessiveness of an award of emotional-distress damages.

We conclude administrative regulations can serve as a source of public policy to give rise to a claim of wrongful discharge from employment. We also conclude an individual corporate officer can be liable for the tort. We further conclude the award of emotional-distress damages in this case was excessive, and punitive damages were not recoverable. We vacate the decision of the court of appeals and affirm the decision of the district court in part, reverse in part, and remand for further proceedings.

## I. Background Facts and Proceedings.

This case arose when Kimberly Jasper was terminated from her employment as the director of a day-care facility in Johnston, Iowa, called Kid University. The center was owned by H. Nizam, Inc. Mohsin Hussain was the president of the corporation. Zakia Hussain was the vice president. The Hussains were married. Mohsin Hussain was a special education teacher for the Des Moines School District and was not involved in the day-to-day operation of the center.[1]

---

[1]Mohsin Hussain will be referred to as Hussain throughout the remainder of this opinion, while Zakia will be identified by her full name. Kid University will be used in this opinion to designate both the corporate entity and its president, Mohsin Hussain.

Jasper began her employment as director of the center in late August 2003. She was paid an hourly wage. There was no specific term of employment. A few weeks after Jasper started her employment, she and her husband agreed to rent a home owned by the Hussains. The Jaspers had moved to Des Moines from Arizona and were looking for housing at the time. Jasper learned the Hussain house was available to rent when she and Hussain went to the house to retrieve some equipment to use at the day-care center that was stored in the house. The house had four bedrooms and two bathrooms, but had sustained substantial water damage and was in a general state of disrepair. The agreed monthly rent was $10, plus utilities, and the Jaspers were required to make all repairs to the house at their own expense.

Within a short time after Jasper started her employment, Hussain told her the center was not making enough money to justify the size of the staff. He also encouraged Jasper to attract more children to the center. Jasper responded by telling Hussain that any staff cuts would place the center in jeopardy of violating state regulations governing the minimum ratios between staff and children. *See* Iowa Admin. Code r. 441—109.8 (2003). Hussain was generally aware of the staffing requirements imposed by state regulations through his contact with a consultant and compliance official from the Iowa Department of Human Services. The consultant dealt with licensing and regulatory compliance of day-care facilities. She would periodically stop by the center to determine if the facility was being operated in compliance with all regulations. Hussain had also hired a private consultant prior to employing Jasper. The private consultant also informed Hussain of the necessity to comply with the state ratio requirements. Within a month

after Jasper started her employment, Hussain was again told of the staffing ratios at a meeting with both consultants and Jasper.

The staff-to-child ratio became a frequent subject of conversation, and friction, between Hussain and Jasper. Hussain was persistent in his desire to reduce staff to decrease expenses, and Jasper was adamant that the current staff was necessary to meet the minimum staffing ratios under the state regulations. During one meeting with the Hussains and Jasper in early November, staff reductions were again discussed. Jasper claimed Zakia Hussain said, "What [the department of human services consultant] doesn't know won't hurt her." Hussain made no response to the statement. In fact, Hussain never specifically told Jasper to violate or ignore the staffing regulations.

At a meeting between Hussain and Jasper later in November, Hussain proposed that Jasper and her assistant director begin to work as staff in the classrooms occupied by the children as a means to cut staff and reduce expenses. Jasper objected to the plan as unreasonable. She believed it would prevent her from performing her duties as director of the center and risk placing the center in violation of the ratio regulations.

On December 1, 2003, Hussain terminated Jasper from her employment with Kid University shortly after she arrived for work at the center in the morning. She was handed a written letter listing the reasons for the termination and was escorted outside the building. A confrontation followed after she was told she could not return to the building to remove her children from the day-care center, and police were called.

Hussain also brought a forcible entry and detainer action against the Jaspers for failing to pay the December rent. Jasper and her family

subsequently moved from the house, and she obtained new employment with another day-care facility in April 2004.

Jasper brought a wrongful-discharge action against the corporation and Hussain individually. She claimed Hussain terminated her employment because she refused to violate the staff-to-child ratios, in violation of public policy of this state. She sought damages for lost earnings, emotional pain and suffering, and punitive damages. She also sought damages relating to the termination of the rental agreement and for unreimbursed expenses relating to improvements made to the center. At trial, Jasper presented testimony that the center violated the staff-to-child ratios shortly after she was terminated. This violation occurred when one staff member was left in a classroom to supervise five or more children between the ages of one and two years old. The regulations promulgated by the department of human services required one staff member for every four children under the age of two. However, the district court refused to permit Jasper to present evidence that a second day-care facility owned by Hussain had been cited by the state for violating the staff-to-child ratios.

Jasper presented evidence of her damages, including lost wages, pain and suffering, expenses relating to the house, and unreimbursed services and expenses relating to the day-care facility. Her damages for emotional distress suffered as a result of the termination from employment were supported by her testimony concerning her emotional state following the termination, as well as the testimony of her husband and sister.

In particular, Jasper testified she "was a wreck" during the days immediately following the termination, and "cried a lot." During the weeks following the termination, she "didn't sleep a lot" and "worried

about money." The holiday season following the termination was particularly hard on her, largely due to the financial strain from being unemployed and having to rely upon her husband's income. At times, she "didn't want to get out of bed," and began to experience "anxiety attacks." On one occasion in February 2004, she testified she went to a hospital emergency room because she believed she was experiencing a "heart attack." A doctor prescribed antidepressant and antianxiety medication. Jasper did not testify about her emotional state beyond a couple of months after the termination and certainly nothing after the time she became reemployed. Jasper was hired as the director of another day-care facility in the Des Moines area in April 2004. She worked part-time on occasion at a day-care facility prior to that employment.

Jasper's husband testified his wife was "crying and sobbing" on the day of the termination and that she later became somewhat "distant." She was also "short" with the children and was generally depressed. He also testified she started to gain weight she had lost prior to the termination. Jasper's sister testified Jasper was "withdrawn" after the termination and lacked the "confidence" she had prior to the termination.

The jury returned a verdict for Jasper against the corporation and Hussain individually, based solely on the tort of wrongful discharge in violation of public policy. The jury awarded Jasper lost wages of $26,915 and past emotional distress of $100,000. It awarded her $39,507.25 for expenses relating to the house and additional services and expenses. The district court refused to submit the punitive-damage claim to the jury.

During the trial, the district court reserved ruling on a motion for directed verdict made by Kid University. After the jury verdict was

returned, the district court granted the motion. It determined Jasper failed to establish the existence of a well-recognized and clearly defined public policy to support her cause of action and that she failed to present substantial evidence to show she was terminated for refusing to violate the state staffing regulations. The district court then proceeded to determine additional claims Kid University raised in a motion for new trial. The court determined the damages for emotional distress of $100,000 were excessive and reduced the award to $20,000. It determined damages relating to the rental house and unreimbursed expenses were independent of the wrongful-termination-of-employment action and could not be recovered under the claim.

Jasper appealed, and we transferred the case to the court of appeals. The court of appeals determined a clear public policy existed in Iowa that day-care centers be adequately staffed. It also found Jasper presented substantial evidence to support a finding that she refused to reduce staff below the minimum ratios and that this conduct was the cause of her termination. The court of appeals then determined the district court did not err in finding the $100,000 award for emotional distress was excessive and in setting aside the award of $39,507.25 for additional services and housing expenses. However, the court of appeals treated the reduction of the award for emotional distress as a remittitur and remanded the case to the district court to give Jasper the opportunity to accept the remittitur or a new trial. In the event of a new trial, the court of appeals determined the district court erred in failing to permit the jury to consider the punitive-damage claim and further found the district court erred in failing to admit the excluded evidence. Finally, it found Hussain failed to preserve his claim that he could not be

personally liable for the tort because the district court failed to rule on the issue after granting the directed verdict.

Kid University and Hussain sought, and we granted, further review. They argue no clearly defined and well-recognized staff-to-child ratio for day-care centers exists to support a cause of action for wrongful discharge. They also argue there was insufficient evidence Jasper was terminated for engaging in any protected activity. Additionally, Hussain claims the issue of individual liability was properly preserved and only the corporation as the employer can be liable for claims of wrongful discharge. Finally, Kid University and Hussain seek review of other issues decided by the court of appeals that will be relevant in the event of a new trial.

## II. Standard of Review.

We review rulings by the district court on a motion for judgment notwithstanding the verdict for errors at law. *See Summy v. City of Des Moines*, 708 N.W.2d 333, 343–44 (Iowa 2006) (reviewing a directed verdict for errors at law); *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001) (reviewing judgment notwithstanding the verdict for errors at law). We also review the issue of personal liability of a corporate officer or employee for errors at law. Iowa R. App. P. 6.4. Our review of a motion for a new trial based on discretionary grounds is for abuse of discretion. *Olson v. Sumpter*, 728 N.W.2d 844, 848 (Iowa 2007).

## III. Public-Policy Exception to Employment-at-Will Doctrine.

**A. Overview.** We adhere to the common-law employment-at-will doctrine in Iowa. *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000). However, we joined the parade of other states twenty years ago in adopting the public-policy exception to the employment-at-

will doctrine.  *Id.* at 281.  In doing so, we recognized a cause of action in Iowa for wrongful discharge from employment when the reasons for the discharge contravene public policy.  *Id.*  Since the adoption of this exception, we have identified and explained the elements of the cause of action.  *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004).  These elements are:  (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) there was no overriding business justification for the termination.  *Id.*; *accord Fitzgerald*, 613 N.W.2d at 282 n.2.

This case primarily focuses on the public-policy element of the tort and ultimately requires us to decide if the source of public policy can be derived from administrative regulations.  Yet, the case also requires us to consider the parameters of the public-policy element and to dig into the element to unearth and identify the often difficult distinction between a claim based on public policy and a claim based on a private dispute between an employer and employee.  In this way, we must also consider the element of the tort that requires the employee to establish that the discharge was caused by the employee's participation in an activity protected by public policy.

**B. Sources of Public Policy.**  The concept of public policy generally captures the communal conscience and common sense of our state in matters of public health, safety, morals, and general welfare. *Truax v. Ellett*, 234 Iowa 1217, 1230, 15 N.W.2d 361, 367 (1944). Although public policy can be an elusive concept, once recognized, it becomes a benchmark in the application of our legal principles.  *See In re Marriage of Witten*, 672 N.W.2d 768, 779 (Iowa 2003) (recognizing the

definition of public policy is largely elusive).  We have used public policy to constrain legal principles in many areas of the law, especially contracts.  While we continue to adhere to the doctrine of employment at will, we have always recognized that parties may not incorporate matters into contracts that are contrary to our public policy.  *Walker v. Gribble*, 689 N.W.2d 104, 110–11 (Iowa 2004).  This fundamental principle actually dates back to one of our first cases as a territorial court in 1839, when we refused to enforce a contract for slavery.  *See In re Ralph*, 1 Morris 1 (Iowa 1839).  Thus, the public-policy exception to the employment-at-will doctrine carries forward a hallmark concept of this state; that the rights of each individual in a civilized society are ultimately "limited by the rights of others and of the public at large" and that the delicate balance between these rights is what helps hold us together as a society.  *Gantt v. Sentry Ins.*, 824 P.2d 680, 686–87 (Cal. 1992), *overruled on other grounds by Green v. Ralee Eng'g Co.*, 960 P.2d 1046 (Cal. 1998); *see also Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 523 (Colo. 1996) ("The rationale underlying the [discharge-in-violation-of-public-policy] exception was the long-standing rule that a contract violative of public policy is unenforceable.").  When a contract violates public policy, including a contract of employment, the entire community is damaged.

In each case we have decided since adopting the public-policy exception to the employment-at-will doctrine, we have relied on a statute as a source of public policy to support the tort.  *See, e.g., Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994); *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988).  At the same time, we have consistently rejected claims of wrongful discharge based on public policy when the public policy asserted by an employee was not derived from a

statute. For example, we have declined to find public policy to support a wrongful-discharge tort based on generalized concepts of socially desirable conduct. *See Lloyd,* 686 N.W.2d at 229–30 (rejecting a claim for wrongful discharge by a private security guard for attempting to uphold criminal laws by arresting a perceived lawbreaker when no statute was identified protecting or promoting the employee activity sought to be protected). We have also held that public policy cannot be derived from internal employment policies or agreements. *See Davis v. Horton,* 661 N.W.2d 533, 536 (Iowa 2003) (holding no cause of action for public-policy discharge of employee for seeking to mediate an employment dispute pursuant to an employee handbook when no statute could be identified that protected the rights of employees to mediate disputes). In fact, consistent with other states, our wrongful-discharge cases that have found a violation of public policy can generally be aligned into four categories of statutorily protected activities: (1) exercising a statutory right or privilege, *Springer,* 429 N.W.2d at 559 (right to file workers' compensation claim); *Lara,* 512 N.W.2d at 782 (right to pursue unemployment benefits); *Teachout v. Forest City Cmty. Sch. Dist.,* 584 N.W.2d 296, 300 (Iowa 1998) (intending to report child abuse); (2) refusing to commit an unlawful act, *Fitzgerald,* 613 N.W.2d at 286 (refusal to commit perjury); *Borschel v. City of Perry,* 512 N.W.2d 565, 567 (Iowa 1994) (referring to refusal "to commit an unlawful act" as one basis for wrongful-discharge claim); (3) performing a statutory obligation, *Fitzgerald,* 613 N.W.2d at 286 (testifying truthfully); and (4) reporting a statutory violation, *see Harvey v. Care Initiatives, Inc.,* 634 N.W.2d 681, 685–86 (Iowa 2001) (recognizing employee, but not independent contractor, right to file complaint against employer). *See generally Gantt,* 824 P.2d at 684; Vanessa F. Kuhlmann-Macro, *Blowing the Whistle on*

*the Employment At-Will Doctrine*, 41 Drake L. Rev. 339, 341–42 (1992) (citing three categories of protected whistle-blowing activity).

Our adherence in our prior cases to identifying statutes as a source of public policy is consistent with our earlier pronouncement that the tort of wrongful discharge should exist in Iowa only as a narrow exception to the employment-at-will doctrine. *See Springer*, 429 N.W.2d at 560 (adopting narrow public-policy exception). The legislature is the branch of government responsible for advancing public policy, and courts can be assured that the tort is advancing "a legislatively declared goal" when public policy is derived from a statute. *See id.* at 561. In turn, we can be assured that the public-policy exception to the employment-at-will doctrine is a product of the balancing by our legislature of the competing interests of the employer, employee, and society. *See Fitzgerald*, 613 N.W.2d at 283. This balance means the discretion employers have to discharge at-will employees without cause will be limited only under narrow circumstances, and the law will continue to give law-abiding employers the freedom to make managerial decisions in the operation of their businesses. *See Green*, 960 P.2d at 1054; *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 880 (Ill. 1981) (observing employer business decisions, no matter how sound, cannot override a decision by the legislature). The use of statutes as a source of public policy also helps provide the essential notice to employers and employees of conduct that can lead to dismissal, as well as conduct that can lead to tort liability. *Fitzgerald*, 613 N.W.2d at 282. The public-policy exception was adopted merely to place a limitation on an employer's discretion to discharge an employee when the public policy is so clear and well-defined that it should be understood and accepted in our society as a benchmark. *See Martin Marietta Corp. v. Lorenz*, 823

P.2d 100, 109 (Colo. 1992) (action directed by employer violates a specific statute relating to public health, safety, or welfare or undermines a clearly expressed public policy relating to the employee's basic responsibility as a citizen with the employee's right or privilege as a worker). Our reliance on statutes as a source of this limitation has been a way to ensure that the tort continues to serve its objectives.

While we have justifiably relied on statutes, we have not closed the door to using other sources as a means to derive public policy to support the tort. We have repeatedly observed that our constitution is a proper source of public policy. *See id.* at 283 (citing *Borschel,* 512 N.W.2d at 567). Moreover, we have recognized that other jurisdictions have used administrative regulations as a source of public policy, yet we have not had the occasion to decide the issue until today. *See id.*; *see also Tullis v. Merrill,* 584 N.W.2d 236, 239–40 (Iowa 1998) (relying on an administrative regulation to find public policy from a statute).

Kid University generally asserts that administrative regulations are an unreliable source of public policy because they are too numerous to serve as a recognized guide for employers and do not actually express the voice of our legislature. It argues that even a regulation pertaining to safety is merely another administrative rule "in a veritable ocean of safety regulations" in this state.

In deciding whether administrative regulations may be used as an additional source of public policy to support the tort of wrongful discharge, we generally observe a strong fundamental congruence between statutes and administrative regulations. Administrative agencies have become an important component of our modern world of governance as a means for our legislature to better deal with the array of complex and technical problems it faces. *See Mistretta v. United States,*

488 U.S. 361, 372, 109 S. Ct. 647, 654–55, 102 L. Ed. 2d 714, 731 (1989) (discussing the development of congressional delegation of authority). Thus, our legislature often delegates its rule-making authority to administrative agencies as a means to better accomplish its objectives in dealing with these problems. *See Auen v. Iowa Dep't of Commerce*, 679 N.W.2d 586, 590 (Iowa 2004) (addressing legislature's delegation of authority to adopt rules necessary to carry out Iowa Code chapter 123). The administrative regulations ultimately adopted are necessarily tied to the broad directives of the legislature and effectuate the intent of the enabling legislation. *See Lenning v. Iowa Dep't of Transp.,* 368 N.W.2d 98, 103 (Iowa 1985) (analyzing the validity of an administrative rule based on whether the rule conflicts with the intent of the enabling legislation). Administrative regulations have the force and effect of a statute. *Stone Container Corp. v. Castle*, 657 N.W.2d 485, 489 (Iowa 2003). Moreover, the regulations are required to be consistent with the underlying broader statutory enactment. *Iowa Dep't of Revenue v. Iowa Merit Employment Comm'n*, 243 N.W.2d 610, 615–16 (Iowa 1976).

These observations reveal that administrative regulations can be an important part of a broader statutory scheme to advance legislative goals. They can reflect the objectives and goals of the legislature in the same way as a statute. Consequently, the justification for relying on statutes as a source of public policy can equally apply to administrative regulations. Administrative regulations have the potential to reflect legislative intent, satisfy our concern that public policy be derived from statutory sources, and can provide the same notice to employees and employers as a statute. The argument that most administrative regulations are too detailed and numerous to serve as a source of public policy is itself too generalized to eliminate all administrative regulations

as a source of public policy. Consequently, we are satisfied that administrative regulations can be used as a source of public policy to support the tort of wrongful discharge when adopted pursuant to a delegation of authority in a statute that seeks to further a public policy. We also recognize this position is consistent with most jurisdictions that have considered the question. *See Green*, 960 P.2d at 1054; *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 149 (3d Cir. 2004) (New Jersey law); *Schatzman v. Martin Newark Dealership, Inc.*, 158 F. Supp. 2d 392, 398–99 (D. Del. 2001) (Delaware law); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 186 P.3d 80, 83 (Colo. Ct. App. 2008); *Sears, Roebuck & Co. v. Wholey*, 779 A.2d 408, 413 (Md. Ct. Spec. App. 2001); *Kittelson v. Archie Cochrane Motors, Inc.*, 813 P.2d 424, 426–27 (Mont. 1991); *Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 39 (Ohio 2007); *Weaver v. Harpster*, 885 A.2d 1073, 1077 (Pa. Super. Ct. 2005); *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 723 (W. Va. 2001); *Bammert v. Don's Super Valu, Inc.*, 646 N.W.2d 365, 369 (Wis. 2002). *But see Rackley v. Fairview Care Ctrs., Inc.*, 23 P.3d 1022, 1030 (Utah 2001).

Nevertheless, a declaration that an administrative regulation can be a source of public policy to support the tort of wrongful discharge does not answer the question whether a particular administrative regulation is a source of public policy to support the tort. To support the tort, an administrative regulation must state a clear and well-defined public policy that protects an activity in the same way as a statute must state a clear and well-defined public policy to support the tort. *See Lloyd*, 686 N.W.2d at 228 (requiring "the existence of a clearly defined public policy that protects an activity"). Thus, the administrative regulation must not only relate to public health, safety, or welfare, but the regulation must also express a substantial public policy in a way that

furthers a specific legislative expression of the policy. Accordingly, we turn to the particular administrative regulation governing day-care facilities at issue in this case to determine if it actually expresses a clear and well-defined public policy that can support a wrongful-discharge claim. While courts do not declare public policy, courts must necessarily determine if public policy has been expressed in a statute or an administrative regulation.

**C. Public Policy Derived From Administrative Rules Governing Staff Ratios of Day-Care Facilities.** Our legislature has chosen to regulate day-care facilities under chapter 237A of the Code. The regulatory agency is the department of human services. Iowa Code § 237A.12. Specifically, this statute authorizes the department to "adopt rules setting minimum standards to provide quality child care in the operation and maintenance" of day-care facilities. Iowa Code § 237A.12(1). The legislature specifically authorized the department to adopt rules regulating

> [t]he number . . . of personnel necessary to assure the health, safety, and welfare of children in the facilities.

Iowa Code § 237A.12(1)(*a*).

One rule adopted by the department in response to this legislative directive establishes specific staff-to-child ratios. Iowa Admin. Code r. 441—109.8. The employee in this case relies upon this administrative rule as a declaration of a public policy that prohibits an employer from discharging an employee for refusing to violate the staff-to-child ratio rule or for insistence on compliance with the rule.

Our prior cases have revealed that not all legislative enactments support a wrongful-discharge tort. Instead, "many statutes simply regulate conduct between private individuals, or impose requirements

whose fulfillment does not implicate fundamental public policy concerns." *Foley v. Interactive Data Corp.*, 765 P.2d 373, 379 (Cal. 1988). The difficult task for courts is to determine which claims involve public policy and which claims involve private disputes between employers and employees governed by the at-will employment doctrine. *See Gantt*, 824 P.2d at 684; *see also Fitzgerald*, 613 N.W.2d at 282 (holding court determines issue as a matter of law). Our prior cases provide many important guidelines.

From the beginning of our adoption of the public-policy exception, we have emphasized that the public policy must be both well recognized and clearly expressed. *Springer*, 429 N.W.2d at 560. These two concepts partially express the important notion that the policy identified must deal with a public interest so that the discharge from employment violates a fundamental, well-recognized interest that serves to protect the public, not individual interests. Of course, the public interest in a policy is most easily observed in those instances when an enactment expressly protects a specific employment activity from adverse employment consequences. *See Tullis*, 584 N.W.2d at 239 (considering a statute that not only permits employees to file claims for wages, but expressly prohibits an employer from discharging employee for filing a claim for wages). Yet, in our seminal case adopting the tort of wrongful discharge, we made it clear that the public policy to support the tort can exist in a statute without an express declaration that the specific activity is protected from adverse employment consequences. *See Springer*, 429 N.W.2d at 560–61. Instead, public policy to support the tort can be found if the statute clearly implies the activity in question is protected in the workplace.

In *Springer*, we found an express declaration in the statute that an employer could not be relieved of any duties imposed under the workers'

compensation statute to be a clear implication of a public policy to protect an employee from adverse employment consequences for filing a claim for benefits. *Id.* The unqualified statutory declaration impliedly captured the specific protected activity to serve as the foundation for the tort. This requirement of aligning public policy with specific statutory language can be observed in our cases that followed *Springer*. *See Fitzgerald*, 613 N.W.2d at 286 (statute that outlaws perjury clearly implies a public policy to protect an employee who either refuses to commit perjury or insists on providing truthful testimony); *Teachout*, 584 N.W.2d at 300–01 (statute that specifically promotes the reporting of child abuse clearly implies a public policy to protect an employee who files a child abuse report from adverse employment activity); *Lara*, 512 N.W.2d at 782 (statute that voids "any agreement" to limit or deprive an employee of unemployment benefits clearly implies a public policy to protect a worker who seeks partial unemployment benefits from adverse employment activity). These cases reflect the principle that the public policy to support the tort must be clear and well-defined so that a legislative declaration of a protected activity will provide the required notice to employers and employees.

On the other hand, legislative pronouncements that are limited in scope may not support a public policy beyond the specific scope of the statute. *See Fitzgerald*, 613 N.W.2d at 285 (statutes that protect against specific discriminatory practices do not imply a public policy to protect workers who engage in conduct not specifically covered from adverse employment action); *Harvey*, 634 N.W.2d at 685–86 (statute that authorizes persons to request state authorities to investigate a nursing home, but only specifically provides whistle-blowing protection to "employees" and "residents" does not imply a public policy to protect

whistle-blowers who are independent contractors). A court may not give public-policy protection that the legislature has chosen not to provide under a statutory scheme. Overall, these prior cases have made it clear that a policy sought to be derived from an enactment must affect a public interest so that the tort advances general social policies, not internal employment policies or individual interests. Consequently, this same approach is applicable to determine if an administrative regulation advances a public policy to support the tort.

In this case, the legislature clearly delegated authority to the department of human services to promulgate specific rules concerning the proper staff-to-child ratios as a means "to assure the health, safety, and welfare of children" in day-care facilities. Iowa Code § 237A.12(1)(*a*). Without question, the protection of children is a matter of fundamental public interest. *Teachout*, 584 N.W.2d at 300–01. *See also Palmateer*, 421 N.E.2d at 876 (observing there is no public policy more important or fundamental than one favoring the effective protection of the lives of citizens). These factors satisfy the goal that the regulation affect the public interest.

Nevertheless, Kid University argues that the specific ratio regulations, while important, are not important enough to limit the discretion of employers to discharge employees. We agree with Kid University that the public policy advanced by the wrongful-discharge tort must be important and that many administrative regulations may not support the tort. However, we have no hesitation in finding that the staff-to-child ratios demonstrate an important public policy in Iowa. Our legislature has specifically said the ratios are needed to protect children, and we have consistently declared the safety of children to be one of our highest priorities in this state. *See In re B.B.M.*, 514 N.W.2d 425, 428

(Iowa 1994) (holding "the welfare of the child is the paramount consideration" in cases dealing with children). We recognize the right of employers to operate a business is also important, but certainly not more important than the health, safety, and welfare of our children. We disagree with the district court that the use of this administrative regulation as a basis for the tort will undermine the at-will employment doctrine. To the contrary, it expresses the type of policy the tort was designed to embrace. Our legislature clearly wanted the ratios to be put into place to protect children, and this important public objective would be thwarted if an employer could discharge an employee for insisting the ratios be followed.

Lastly, Kid University argues that this particular administrative regulation is too detailed and confusing to qualify as a "clearly defined" public policy. It asserts reasonable employers could not expect to know they are violating the public policy behind the ratios by discharging an employee when the ratios are not "clearly defined."

While the particular administrative regulation at issue in this case may be detailed, no reasonable employer with knowledge of the ratio requirements would believe the ratios could be disregarded or that the refusal by an employee to disregard the ratios could be used as a reason to terminate the employee. Any confusion in the application of the ratios would not undermine or diminish the important public policy that day-care facilities in this state be operated with an adequate number of staff as determined by the Iowa Department of Human Services.

We conclude the particular administrative rule at issue in this case supports a clear and well-defined public policy that gives rise to the tort of wrongful discharge. The ratios were implemented at the specific direction of the legislature to protect the health, safety, and welfare of

those children in Iowa who attend day-care facilities. Additionally, the legislature intended for the ratios to be an important component of the larger public policy to protect children and, in turn, established a basic, important component of the operation of a day-care center in Iowa. These factors transform the ratios into a public policy and satisfy the element of the tort that a clear and well-defined public policy that relates to public health, safety, or welfare be identified.

**D. Employee Participation in the Protected Activity as a Cause of the Discharge.** In addition to the existence of a public policy to create a protected activity, the tort of wrongful discharge requires proof that the discharge was a result of the employee's participation in the protected activity. This requirement is frequently identified as the causation component of the tort and requires the employee to show the protected activity engaged in by the employee was the "determinative factor in the employer's decision" to terminate the employee. *Teachout*, 584 N.W.2d at 301.

Kid University first argues Jasper failed to establish this element because there was no evidence it actually violated the ratio requirements during Jasper's term of employment, and there was no evidence Jasper even reported a suspected violation of the ratio requirements to the department of human services during her employment. Thus, Kid University asserts Jasper did not engage in a protected activity to support liability. Instead, it claims Jasper was merely engaged in an internal employment dispute with Kid University over a legitimate employer concern that the center was overstaffed.

We have recognized the tort of wrongful discharge not only protects the reporting of an activity violative of public policy, but also protects the refusal by an employee to engage in activity that is violative of public

policy. *See Fitzgerald,* 613 N.W.2d at 286. Thus, Jasper was not required to show that Kid University knowingly violated the ratio requirements or that she reported a suspected violation to state officials. Under the category of claim brought by Jasper, she was only required to show Kid University wanted her to cut staff below the ratio requirements, and she was discharged for refusing to do so. *See Sears, Roebuck & Co.,* 779 A.2d at 414–15 (" 'Limitation of the claim for [wrongful] discharge to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty, ties [wrongful] discharge claims down to a manageable and clear standard.' " (quoting *Adler v. Am. Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir. 1987)).

Kid University argues there was insufficient evidence to support a finding by the jury that it requested Jasper to violate the ratio requirement or that she refused to do so. Again, Kid University characterizes the dispute as a legitimate employer concern to minimize overhead and expenses in the operation of its business.

We readily recognize the tort of wrongful discharge is not intended to interfere with legitimate business decisions of an employer. Yet, staffing a day-care facility below the minimum requirements established by an administrative rule is not a legitimate business concern.

In this case, there was sufficient circumstantial evidence that Kid University wanted Jasper to reduce staff below the minimum state requirements. Hussain repeatedly urged Jasper to cut staff after Jasper had repeatedly told him the staff ratios were at the minimum levels. The repeated nature of the discussions over the reduction of staff, under the circumstances, was circumstantial evidence that Kid University wanted Jasper to disregard the requirements. Similarly, Zakia Hussain's comment about failing to disclose staff levels to the department of

human services could be viewed as an implied demand to disregard the minimum ratios. Likewise, the evidence that Jasper was discharged within a short time after a discussion over staffing levels, as well as evidence that the center violated the staffing level shortly after Jasper was discharged, circumstantially shows Kid University wanted Jasper to violate the state requirements.

This same evidence supports a finding by the jury that Jasper was discharged because she refused to violate the state requirements. We have said that the timing between the protected activity and the discharge is insufficient, by itself, to support the causation element of the tort. *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992). However, there was ample circumstantial evidence for the jury to conclude Jasper was discharged for refusing to staff at a level below the minimum requirements. Kid University contends it offered ample evidence to justify the decision on grounds that did not violate public policy, but the jury was free to conclude those reasons were merely pretextual. We conclude there was sufficient evidence that Jasper's refusal to violate the administrative regulations was a cause of her discharge and that there was no overriding justification for the termination.

**IV. Compensatory Damages.**

**A. Posttrial Motions Relating to Damages.** Following an adverse verdict at trial, a defendant may file a motion for judgment notwithstanding the verdict and motion for new trial. Iowa Rs. Civ. P. 1.1003, 1.1004. These rules authorize the district court to grant a motion notwithstanding the verdict when the defendant requested a directed verdict at trial at the close of the evidence, was entitled to the directed verdict, and the jury failed to return the verdict. Iowa R. Civ. P. 1.1003. Under these circumstances, the district court may correct the

error by either entering the judgment as if it had directed a verdict at trial or by granting a new trial. *Id.*

When a district court grants a motion for judgment notwithstanding the verdict, it is also required "to rule on any motion for new trial by determining whether it should be granted" in the event the judgment is vacated or reversed on appeal. Iowa R. Civ. P. 1.1008(3). A motion for judgment notwithstanding the verdict and motion for new trial often address different issues, and this requirement promotes judicial economy by allowing all issues to be preserved and decided on appeal.

In this case, Kid University moved for judgment notwithstanding the verdict and, alternatively, for a new trial. The motion for judgment notwithstanding the verdict set forth the claim that Kid University was not liable as a matter of law for the tort of wrongful discharge and further claimed Hussain could not be individually liable for the tort. The alternative motion for new trial included issues relating to damages. Kid University claimed the damages for emotional distress were excessive, and the damages for expenses and services were not recoverable.

After the district court entered judgment notwithstanding the verdict for Kid University and Hussain, it did not separately rule on the claim that Hussain could not be individually liable. However, it proceeded to consider the new-trial issues raised by Kid University in the event the ruling on the motion for judgment notwithstanding the verdict was reversed on appeal. In doing so, it found the award for emotional distress was excessive and should be reduced to $20,000 and held the property damages were not recoverable.[2] Thus, we proceed to determine

---

[2]The district court did not specifically rule that it was conditionally granting the alternative motion for new trial, but merely ruled that the emotional-distress award should be reduced to $20,000 and the award for property damage should be eliminated. However, considering that rule 1.1008 requires a district court to determine if a motion

the issues decided by the district court in the motion for new trial, having found that the district court erred in granting the judgment notwithstanding the verdict.

**B. Overview of Damages and Causation.** Wrongful discharge of employment in violation of public policy is an intentional tort in Iowa. *See Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989). The legal remedy provided for victims of the tort covers the complete injury, including economic loss such as wages and out-of-pocket expenses, as well as emotional harm. *Id.* Emotional harm is a personal injury, and economic loss constitutes property damage. Thus, both personal injury and property damage are recoverable.

Even if an employer wrongfully discharges an employee in violation of public policy and the employee suffers injuries, there can be no liability for the wrongful discharge without a causal connection between the discharge and the injury. The causal link essentially requires the discharge to be an actual cause of the injury and further requires the discharge to be a proximate cause of the injury. Generally, the wrongful discharge is an actual cause of the injury if the employee would not have suffered the same injury had the employer not discharged the employee. *See Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007) (discussing causation

---

for new trial should be granted or denied, we consider the ruling made by the district court to be a conditional grant of a motion for new trial. The ruling expressed grounds that could only support a conditional grant of a new trial. We also observe that rule 1.1010 permits the district court to conditionally grant a new trial by giving a party a choice between consenting to a reduced or modified judgment and proceeding to a new trial. In this case, the district court reduced and modified the verdict, but did not specifically give Jasper the option to avoid a new trial by consenting to the reduced and modified judgment. Nevertheless, we consider the decision by the district court to reduce and modify the verdict to be a conditional new trial under rule 1.1010. Because the new trial was conditioned on appellate review of the district court ruling on the judgment notwithstanding the verdict, there was no need for the district court to further make the new trial conditional under rule 1.1010 until the judgment notwithstanding the verdict was reversed on appeal and remanded for new trial.

generally). The wrongful discharge is a proximate cause of the injury if the injury is not beyond the risks assumed by an employer, so it would not be unjust to hold the employer responsible for injuries actually caused by the wrongful discharge. *See id.*

**C. Property Damage.** The property damage by Jasper included a claim for economic losses based on expenses incurred and work performed in renovating the house rented from the Hussains, expenses incurred in improving the day-care center, and the expenses of renting another house following the discharge. Jasper claims these economic losses arose from the employment agreement and were caused by the wrongful termination. Kid University claims these damages may be recoverable under other theories of liability, but not for the tort of wrongful termination.

Lost future wages and benefits under an employment contract are normally recoverable as compensatory damage in a wrongful-termination action. *See Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 687 (Iowa 1990). Yet, there was insufficient evidence in this case to support a finding that the rental house was a term or a benefit under the employment agreement. The contract of employment was entered into prior to the rental agreement, and the only connection between the two contracts was the identity of the parties and the inconsequential agreement between Hussain and Jasper that the monthly rent for the house would be deducted from Jasper's wages. Clearly, the employment and rental agreements were separate contracts that were entered into as a result of separate bargains. The termination of one of the agreements did not affect the other agreement, and there was no evidence the rental agreement terminated if the employment agreement was terminated. In

fact, Jasper claimed the term of the rental agreement was two years, but acknowledged she was an employee at will.

Without a connection between the contract for employment and the rental agreement, Jasper cannot establish that the expenses and labor for improvements to the rental house prior to discharge would not have been incurred if Kid University had not terminated her from her employment. In fact, the expenses and labor sought by Jasper were incurred prior to the discharge. Similarly, the unreimbursed expenses associated with improvements made to the day-care center had no causal connection to the discharge. Again, Jasper cannot establish those expenses would have been reimbursed if Kid University would not have terminated her employment. The discharge was not shown to be a factual cause of either item of damage, and Jasper has not offered any other theory of causation to establish an actual cause between the claimed injuries and the discharge.

Finally, we consider if the evidence was sufficient to support a finding that the expenses of maintaining a different house after Jasper's move from the house rented from the Hussains was causally connected to the discharge. This item of damages is largely predicated on the greater amount of rent incurred by Jasper for the new house over the eighteen months that remained on the rental agreement for the Hussain house. Thus, the claim necessarily considers that the Hussain home had a rental value equal to the monthly cost of repairs plus $10. While Jasper may not have incurred the increased amount of rent for a different home if she had not been discharged, she has failed to explain how it would be just to hold an employer responsible for the consequences of her move to a new house with a greater rental value.

Even if actual causation was established, the discharge was not a proximate cause of the expenses of renting a new home.

The district court did not err in granting a new trial. The property damage award was not recoverable.

**D. Personal Injury.** A court may grant a new trial based on a number of grounds, including when an excessive or inadequate award of damages was made that was influenced by passion or prejudice or when the verdict was not supported by sufficient evidence. Iowa R. Civ. P. 1.1004(4), (6). The district court in this case relied on both grounds in granting the motion for new trial. It concluded the jury award of $100,000 for emotional distress was excessive due to passion or prejudice by the jury and the award was not supported by sufficient evidence.

We begin our review of the decision by the district court to grant a new trial by considering the excessiveness of the award for emotional distress based on passion or prejudice. We recently discussed and applied this standard in *WSH Properties, L.L.C. v. Daniels*, 761 N.W.2d 45 (Iowa 2008). In *Daniels* we emphasized that a clearly excessive verdict gives rise to a presumption that it was the product of passion or prejudice. *WSH Props.*, 761 N.W.2d at 50. Without such a presumption, passion or prejudice must be found from evidence appearing in the record. *Id.* In either event, the grant of a new trial under rule 1.1004(4) is based on the presence of passion or prejudice in the award of damages. This proposition is what distinguishes the grant of new trial under rule 1.1004(4) from the grant of a new trial based on the insufficiency of evidence under rule 1.1004(6). An excessive award of damages that was influenced by passion or prejudice is necessarily

based on insufficient evidence, but a verdict based on excessive damages can occur in the absence of passion or prejudice.  *See id.*

In this case, the district court believed passion and prejudice was afoot in the award of emotional-distress damages by the jury, but additionally found there was insufficient evidence presented by Jasper at trial to sustain an award for emotional-distress damages of $100,000.  Both claims must be addressed because an excessive award of damages due to passion or prejudice may not be remitted on appeal as a condition of avoiding a new trial.  *WSH Props.*, 761 N.W.2d at 49–50.

While the district court expressed a belief that the jury was motivated by passion and prejudice in making its award of emotional-distress damages, we require this ground for a new trial to be affirmatively established.  *Id.*  The district court indicated prejudice was established by the nature of the case and because Hussain was of Indian descent, spoke in nonnative English, and was unsympathetic as a witness.  We find these reasons, without more, fail to affirmatively show prejudice by the jury.

We have not previously considered the sufficiency of evidence to support an award of damages for emotional distress in a wrongful-termination-of-employment action.  We have, however, said that the amount of an award is primarily a jury question, and courts should not interfere with an award when it is within a reasonable range of the evidence.  *Kautman v. Mar-Mac Cmty. Sch. Dist.*, 255 N.W.2d 146, 147 (Iowa 1977).

At the outset, we recognize Kid University does not claim the evidence in this case failed to support an award for emotional-distress damages.  Instead, it only claims the evidence did not support an award of $100,000.  Additionally, it is generally recognized that damages for

pain and suffering are by their nature "highly subjective" and are not "easily calculated in economic terms." *Shepard v. Wapello County*, 303 F. Supp. 2d 1004, 1021 (S.D. Iowa 2003). Nevertheless, an award for emotional-distress damages is not without boundaries, but is limited to a reasonable range derived from the evidence. *Id.* Accordingly, it is helpful in considering a claim of excessive damages to consider the rough parameters of a range from other like cases. *Id.* Of course, we have said that precedent is of little value when determining the excessiveness of a verdict. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 861 (Iowa 1973). Yet, this approach does not mean other cases should not be used to establish broad ranges from which to examine particular awards of emotional-distress damages.

In *Shepard*, the court reviewed a host of cases addressing claims of excessiveness of emotional-distress damages in employment cases. While emotional-distress damages tend to range higher in employment cases involving sexual harassment and discrimination and other cases involving egregious, sometimes prolonged, conduct, the awards are noticeably less in cases involving a single incident of wrongful discharge that gives rise to the common consequences of any involuntary loss of employment, such as "anger, confusion, loss of esteem, financial worry, and the effect on marital relationships." *Shepard*, 303 F. Supp. 2d at 1022–23. In *Kucia v. Southeast Arkansas Community Action Corp.*, 284 F.3d 944, 948 (8th Cir. 2002), the court said an emotional-distress award in a wrongful-termination action of $50,000 presented a "close" question of excessiveness. The plaintiff testified in the case that the termination resulted in low self-esteem, general uneasiness, loss of sleep, and marital problems. *Kucia*, 284 F.3d at 947. Some of these problems still persisted at the time of trial. *Id.* In *Frazier v. Iowa Beef Processors,*

*Inc.*, 200 F.3d 1192, 1194 (8th Cir. 2000), the court said an emotional-distress award in a wrongful-termination case of $40,000 appeared "generous," but not "excessive." The plaintiff in the case testified he lost his dignity and self-esteem and felt lost and empty. *Frazier*, 200 F.3d at 1193. His wife testified he was a "broken man." *Id.* In *Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1196 (8th Cir. 2000), the court held an award of $75,000 was not excessive. In that case, the termination left the plaintiff devastated, withdrawn, and plagued by back pain, muscle stress, and stomach problems. *Foster*, 250 F.3d at 1196. She had not yet fully recovered by the time of trial and feared she would be unable to find another job. *Id.* Even more egregious circumstances, however, can push the range of emotional-distress damages higher. In *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783 (8th Cir. 2001), the court upheld an emotional-distress award of $165,000. In that case, the plaintiff had worked for the company for thirty-four years, the last sixteen years as the manager, and was close to retirement. *Mathieu*, 273 F.3d at 773. The termination substantially altered his financial future. *Id.*

This sampling of cases provides a helpful context within which to evaluate the excessiveness of an award of emotional-distress damages. These cases reveal that the upper range of emotional-distress damages increases as the nature of the wrongful conduct involved becomes more egregious, and the emotional distress suffered becomes more severe and persistent. Even the length of the employment, compatibility of the worker in the employment, age and employment skills of the worker, and the span of time necessary to become reemployed impact the amount of emotional-distress damages.

While a broad range of emotional-distress damages in all employment-termination cases may support awards of $200,000 and beyond, termination cases involving a single incident of wrongful-termination conduct producing the more common consequences of any involuntary loss of employment support a much lower range of damages. Jasper's case should be evaluated from this lower range. A number of reasons support this conclusion. First, Jasper only worked for the day-care center for a few months prior to termination. Second, she was a relatively young person at the time of her termination and was able to become reemployed on a full-time basis as a director of another day-care facility within five months after her termination. Third, the evidence of emotional distress was not supported by medical testimony and was largely nonspecific. Most of the evidence was confined to general descriptive observations, restricted to the first days and months following the termination. There was no evidence the emotional distress she experienced after losing her job continued for a prolonged period of time.

We recognize Jasper was briefly denied access to her children at the time she was terminated and was confronted by police before she left the day-care center with her children. This evidence distinguishes this case from others, but the distress it produced involved a short period of time.

In the end, we are unable to conclude the district court abused its discretion in finding the emotional-distress damages were excessive. While courts must respect the jury process, we too must respect the vantage point of the district court in assessing the evidence in ruling on a motion for new trial. This is especially true of a trial court's decision to grant a new trial, as we are "slower to interfere with the grant of a new trial than with its denial." Iowa R. App. P. 6.14(6)(*d*). Clearly, an award

of $100,000 for emotional distress would not fall within the range of cases supported by evidence of egregious conduct and special circumstances. The district court did not abuse its discretion in determining the case fell within the lower range of emotional-distress damages and did not err in granting a new trial based on insufficient evidence to support an award of emotional-distress damages of $100,000.

## V. Punitive Damages.

Generally, punitive damages may be awarded in an action for wrongful discharge from employment in violation of public policy. *See Tullis*, 584 N.W.2d at 241. Wrongful discharge in violation of public policy involves intentional conduct and will give rise to a claim for punitive damages when the discharge is committed with either actual or legal malice. *See Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (holding punitive damages are recoverable only when the defendant acts with actual or legal malice). Legal malice is shown when the wrongful conduct is committed with a reckless or willful disregard for the consequences of the conduct. *Id.*

We have refused to permit punitive damages in an action for retaliatory discharge when the grounds for the discharge have been recognized for the first time in the instant case to be in violation of public policy. *Lara*, 512 N.W.2d at 782. The rationale behind this rule is an employer cannot willfully and wantonly disregard rights of an employee derived from some specific public policy when the public policy has not first been declared by the legislature or our courts to limit the discretion of the employer to discharge an employee at the time of the discharge. *See Smith*, 464 N.W.2d at 687.

Although the tort of wrongful discharge in violation of public policy has been recognized in Iowa for over twenty years, this case is the first time we have specifically recognized a cause of action for wrongful discharge arising from the refusal of the employee to violate administrative rules. Additionally, there has otherwise been no declaration that the subject matter of the administrative rules in dispute in this case were of the type that would support a tort of wrongful discharge. Consequently, we agree with the district court that punitive damages were not recoverable in this case. The district court properly refused to submit the punitive-damage claim to the jury.

## VI. Personal Liability of Corporate Officer.

**A. Preservation of Error.** We first address the argument by Jasper that Hussain failed to preserve his claim that he cannot be individually liable for any wrongful termination by Kid University. Hussain submitted the claim to the district court in a motion for summary judgment prior to trial and again in a motion for judgment notwithstanding the verdict after the trial. The district court granted the motion for judgment notwithstanding the verdict, but only on the alternative ground that there was no underlying tort for wrongful discharge as a matter of law. Thus, Hussain was ultimately successful in obtaining a dismissal of the case against him, but not on the specific grounds that a corporate officer or employee of the corporation could not be individually liable for the tort. Jasper then appealed, and Hussain raised the issue of individual liability as an alternative ground for affirming the district court ruling on appeal. Jasper now claims Hussain failed to preserve error for appeal because he failed to raise the issue by way of a cross-appeal and further failed to request a ruling by the district

court after the court dismissed the case on grounds that no cause of action existed.

Hussain was not required to cross-appeal or to request the district court to rule on the issue after the district court dismissed the case on other grounds. As a successful party at trial, error was preserved by asserting the claim before the district court.[3] An erroneous decision by the district court can be affirmed on appeal based on a different ground that was properly raised at trial. *State ex rel. Miller v. Nat'l Farmers Org.*, 278 N.W.2d 905, 906 (Iowa 1979).

**B. Individual Liability of Corporate Officer and Employee.** We adopted the tort of wrongful discharge in violation of public policy within the context of liability of an employer. In the subsequent development of our law on the tort, we have not addressed the issue of individual liability of corporate officers and other employees who participate in the discharge. We have in existence, however, a rich body of law that generally imposes individual liability on corporate officers for their own torts, even when acting in their official corporate capacity. *Haupt v. Miller*, 514 N.W.2d 905, 907–09 (Iowa 1994); *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 809 (Iowa 1978); *Grefe v. Ross*, 231 N.W.2d 863, 868 (Iowa 1975); *White v. Int'l Text-Book Co.*, 173 Iowa 192, 194,

---

[3]We recognize the familiar rule of appellate review that issues must ordinarily be raised and decided by the district court before we will decide them on appeal. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). When the district court fails to rule on an issue raised by a party, the party who raised the issue must file a motion requesting a ruling to preserve error for appeal. *Id.* However, this rule does not apply to the party who was successful before the district court. When the district court dismisses a case based on one of several grounds asserted by a party, the successful party is not required to request the district court to also rule on the other grounds in order to assert those grounds in support of affirming the district court ruling on appeal. *Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993) ("A successful party, without appealing, may attempt to save a judgment on appeal based on grounds urged in the district court but not considered by that court.").

155 N.W. 298, 299 (1915) ("The corporation and its servants, by whose act the injury was done, may be joined in an action of tort in the nature of trespass." (quotations omitted)); Restatement (Third) Agency § 7.01, at 115 (2006) ("An agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment."). In adopting this rule, we reasoned that the legal status of a corporation as an independent entity was not created to insulate officers from liability for their own tortious conduct, but was only intended to generally insulate shareholders from individual liability for corporate conduct and officers from liability for corporate contracts. *Haupt*, 514 N.W.2d at 909. To impose individual liability, however, the corporate officer must personally participate in the tortious conduct. *Id.*

While we have not previously considered the question of individual liability for the tort of wrongful discharge, a few jurisdictions have decided the issue with mixed results. Those states that impose liability on an individual employee who participates in the tort of wrongful discharge essentially view wrongful discharge as any other tort within the existing rule that imposes individual liability on employees for their own tortious conduct. *See DeCarlo v. Bonus Stores, Inc.*, 512 F.3d 173, 177 (5th Cir. 2007); *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 458 (Ariz. Ct. App. 2007); *Ballinger v. Del. River Port Auth.*, 800 A.2d 97, 110–11 (N.J. 2002); *Harless v. First Nat'l Bank*, 289 S.E.2d 692, 698–99 (W. Va. 1982). Those courts that refuse to impose personal liability do not challenge the general rule of individual liability of corporate officers for their own tortious conduct, but essentially conclude the tort can only be committed by the person or legal entity that employs the terminated

employee. *See Hooper v. North Carolina*, 379 F. Supp. 2d 804, 814–15 (M.D.N.C. 2005) (North Carolina law); *Miklosy v. Regents of the Univ. of Cal.*, 188 P.3d 629, 644–45 (Cal. 2008); *Buckner v. Atl. Plant Maint., Inc.*, 694 N.E.2d 565, 569 (Ill. 1998); *Rebarchek v. Farmers Coop. Elev.*, 35 P.3d 892, 903 (Kan. 2001); *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 855–56 (N.M. 1994); *see also Reno v. Baird*, 957 P.2d 1333, 1347 (Cal. 1998). These courts reason that an individual officer or employee of a corporation cannot commit the tort of wrongful discharge because an individual officer or employee has no authority separate from the authority exercised on behalf of the corporation to discharge an employee of the corporation. In this way, these courts view the discharge as an element of the tort, as well as the injurious act, which an officer or employee commits only as an agent of the corporation. In other words, wrongful discharge is a corporate tort within a corporate setting, not an individual tort.

While all courts who have considered the question of individual liability rely at least in part on the general legal principles governing individual liability in a corporate setting, we think the more fundamental question is whether the tort itself should apply to the conduct of individuals who act in the name of the corporation. If the tort includes individual liability independent of corporate liability, then the corporate structure will not insulate individual officers and employees authorized to make discharge decisions from liability for the underlying tortious conduct in exercising that authority. *See Haupt*, 514 N.W.2d at 907 (legal fiction of the corporation as an independent entity serves in part to insulate officers from liability for corporate contracts, not from liability for their own torts).

We acknowledge that an officer or employee of a corporation who discharges an employee in the name of the corporation has no contractual liability in the event the discharge violates an obligation under an employment contract. The limited-liability principles of corporate law serve to insulate officers from liability for corporate contracts and obligations. Tort law, however, concerns liability imposed by society for acts by individuals deemed to be undesirable in society. The tort seeks to encourage responsibility for individual behavior.

The tort of wrongful discharge is clearly influenced by contract law because the tort involves the termination of an employment relationship between an employee and employer. However, that influence does not control the scope of liability under the tort. The tort of wrongful discharge does not impose liability for the discharge from employment, but the wrongful reasons motivating the discharge. In an at-will employment arrangement, an employer can terminate an employee for any reason that does not violate public policy. Thus, in the context of tort law, the reason for the discharge is the undesirable, injurious act prohibited by the tort. It is this act that gives rise to liability, not the termination of the employment arrangement per se. Since the tort is directed at the reasons behind the discharge, not the discharge itself, the type of authority exercised by the person who carries out the discharge for violations that violate public policy is largely irrelevant. Our tort laws should be applied to encourage responsible behavior for all individuals, not insulate unwanted conduct by individuals based on the legal fiction of a corporation as an independent entity. *See Haupt*, 514 N.W.2d at 909. The purpose of the tort will clearly be better served if corporate decision makers are held to the same standard of responsibility imposed on corporate actors for other tortious conduct.

Some courts have expressed a concern that the imposition of personal liability on supervisors and others for wrongful discharge would adversely affect the management of personnel in the corporate world. *See Reno*, 957 P.2d at 1341–42. Yet, the very purpose of the tort is designed to alter the dynamics of the management of personnel by encouraging management to make decisions consistent with fundamental principles of public policy and by giving employees the freedom to refuse to follow management decisions inconsistent with such policy.

Moreover, we do not need to decide how deep the tort could reach in the corporate chain of management in a particular situation. In this case, Hussain was essentially Kid University. Hussain authorized and directed the decision making, including the decision to terminate Jasper. Thus, we only hold that liability for the tort can extend to individual officers of a corporation who authorized or directed the discharge of an employee for reasons that contravene public policy. Hussain may be held individually responsible for wrongfully discharging Jasper. We reinstate the verdict against Hussain.

**C. Remittitur.** Subject to the condition we impose later in this opinion, Kid University is entitled to a new trial. However, we conclude the new trial should be limited to damages for emotional distress. No error affected the jury's determination that Kid University was liable for wrongful discharge and that Hussain was individually liable. The same observation holds for the jury's determination of damages for lost wages. Additionally, the district court did not err in setting aside the award for other economic damages and properly denied the claim for punitive damages. A new trial is necessary only because the award of emotional-distress damages was excessive and not supported by sufficient evidence.

When a damage verdict is excessive because it is not supported by sufficient evidence, we may order a remittitur as a condition to avoiding a new trial. *WSH Props.*, 761 N.W.2d at 49–50; Iowa R. Civ. P. 1.1010. This procedure seeks to provide fair compensation, yet avoid the time and expense of a new trial. Thus, we may impose a condition on the grant of a new trial in this case to allow Jasper an opportunity to accept a reduced and modified judgment.

When a remittitur of damages is granted, only the excess of the award is remitted. *Id.* at 50. Generally, this standard means the award should be reduced "to the maximum amount proved" under the record. *In re Knickerbocker*, 827 F.2d 281, 289 n.6 (8th Cir. 1987).

We have already determined that the absence of aggravating circumstances places this case into the lower range of emotional-distress damages for wrongful-termination cases. Under the record presented, we conclude the maximum award is $50,000. We are primarily influenced both by Jasper's relatively brief period of employment and unemployment. Her personal identity was not tied to this particular employment, and she found new employment in the same field and in the same position within a relatively short period of time. On the other hand, the manner of her discharge was at best insensitive, principally because she was not allowed to retrieve her children and the police were called. In addition, she experienced emotional distress, particularly on the day of her discharge and on other days for several months, but not much more than the common manifestations of any job loss. Jasper may accept this reduced amount of damages for emotional distress to avoid a new trial.[4]

---

[4]The district court properly granted a new trial in this case based on the excessive damages for emotional distress and the improper award of property damages.

**VII.  Conclusion.**

We affirm the district court in part and reverse in part.  We remand for a new trial in accordance with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except Streit and Baker, JJ., who take no part.

---

The remittitur of $20,000 imposed by the district court lost force and effect when Jasper appealed, and therefore, the amount of the remittitur was not the specific subject of our review.  *See* Iowa R. Civ. P. 1.1010(3) ("In the event of an appeal any such term or condition or judgment entered pursuant to district court order shall be deemed of no force and effect and the original judgment entered pursuant to rule 1.955 shall be deemed reinstated.").  However, upon finding the district court did not abuse its discretion in granting a new trial in this case, we are authorized to impose a new remittitur on remand as a condition of the new trial.  *See WSH Props. v. Daniels*, 761 N.W.2d 45 (Iowa 2008).  Thus, Kid University is entitled to a new trial, but the new trial is conditioned upon the refusal of Jasper to accept the remittitur to $50,000 for emotional-distress damages on remand.