# IN THE SUPREME COURT OF IOWA

No. 22–0005

Submitted November 16, 2022—Filed June 23, 2023

**POLLY CARVER-KIMM,**

    Appellee,

vs.

**KIM REYNOLDS, PAT GARRETT,** and **STATE OF IOWA,**

    Appellants.

---

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

The appellants appeal the district court's denial of their motion to dismiss statutory and common law wrongful discharge claims brought by a former state agency employee. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., Waterman, and Mansfield, JJ., joined. McDonald, J., filed an opinion concurring in part and dissenting in part, in which Oxley and May, JJ., joined.

Brenna Bird, Attorney General, Samuel P. Langholz (argued), Chief Deputy Attorney General, Jeffrey C. Peterzalek and Tessa M. Register, Assistant Attorneys General, for appellants.

Thomas J. Duff (argued) and Jim T. Duff of Duff Law Firm, P.L.C., West Des Moines, for appellee.

Jessica A. Zupp of Zupp and Zupp Law Firm, P.C., Denison, for amicus curiae Iowa Freedom of Information Council.

Jessica A. Zupp of Zupp and Zupp Law Firm, P.C., Denison, and Peter E. Larsen of Larsen Law Firm, PLLC, Urbandale, for amicus curiae Iowa Association for Justice.

**McDERMOTT, Justice.**

Polly Carver-Kimm sued the State of Iowa, the Governor, and the Governor's communications director for wrongful discharge of her employment with the Iowa Department of Public Health. Carver-Kimm alleges that she was forced out of her job because of her refusal to stifle public records requests to the department during the early months of the COVID-19 pandemic. The defendants moved to dismiss her claims against them, arguing that they can't be liable for her alleged wrongful discharge because they lacked authority to discharge her, that they're protected by qualified immunity, and that Iowa's open records statute doesn't support a claim for wrongful discharge in violation of public policy. The district court denied the motion to dismiss, and they sought immediate appeal under the qualified immunity statute.

**I. Facts and Procedural Background.**

Because this case involves an appeal from the denial of a motion to dismiss, we accept the facts as alleged in the petition as true. *Meade v. Christie*, 974 N.W.2d 770, 772 (Iowa 2022).

Carver-Kimm had worked for the Iowa Department of Public Health since 2007. Although her original title of "public information officer" changed during her tenure to "communications director," her duties remained the same. Throughout her time with the department, she was in charge of all media communications for the department, including public information requests and COVID-19-related communications.

In early March 2020, the State activated emergency protocols in response to the pandemic, and the procedures that had been in place to respond to information requests started changing. Pat Garrett, the Governor's communications director, on at least one occasion told Carver-Kimm to "hold" the production of records—a list of questions to be used as part of the Test Iowa website evaluation—even though the records had already been approved for production by the assistant attorney general working with the department. The department's deputy director, Sarah Reisetter, also told Carver-Kimm that all press releases should go through the Governor's office. Shortly thereafter, all pandemic-related media inquiries were routed through Reisetter. When Reisetter later complained about the volume of media inquiries coming in, Carver-Kimm offered to reassume responsibility for responding to them. Reisetter suggested that would pose a problem "for other people." Soon after, a legislative liaison for the department began handling pandemic-related media inquiries. Carver-Kimm was told this change was made because the liaison was working out of the State Emergency Operations Center. Carver-Kimm soon began working from there as well but was not asked to handle pandemic-related media responses.

In April, Garrett complained that Carver-Kimm was posting daily new case numbers to the department's website before the Governor's press conference. Carver-Kimm told Reisetter that she'd done this only once, several weeks before, and complained that she was being accused of something she didn't do. The next day, the department's director, Gerd Clabaugh, told Carver-Kimm that she was no longer allowed to update the department's website.

The next week, after telling her supervisors that a news reporter had alleged unsanitary conditions at the State Emergency Operations Center, Carver-Kimm claims multiple people, including Clabaugh, demanded the reporter's name. When she refused, more job duties were taken away from her, including being in charge of social media and working with local government entities.

In early May, Carver-Kimm produced records in response to an open records request from Iowa Public Radio. Later that month, *The New Yorker* and *USA Today* made a similar open records request. Carver-Kimm informed them that if they slightly modified their requests, she could immediately provide the emails that had already been approved for release to Iowa Public Radio. Both news organizations then modified their requests and asked Carver-Kimm to send them all responses to open records requests by any other news organization. Carver-Kimm, citing this as a common practice in state government, did so.

In late May, *The New Yorker* began asking questions critical of the State Hygienic Lab and referenced documents produced in response to the open records request. Reisetter asked how *The New Yorker* received the documents and whether producing the documents "was even legal." In early June, Carver-Kimm was removed from responding to all open records requests. After *The New Yorker* published an article critical of the Test Iowa program in mid-June, Carver-Kimm was no longer allowed to respond to media requests involving COVID-19 or any other infectious disease.

Throughout these months, Carver-Kimm had regular conversations with a human resources manager in the department. She complained about the removal of her duties and expressed her view that it amounted to mismanagement and abuse of authority, and that it created a danger to the public given the ongoing pandemic.

In July, a reporter for *The Des Moines Register* asked Carver-Kimm for pregnancy-termination statistics for the State of Iowa. Carver-Kimm provided the information. The newspaper thereafter ran an article showing an increase in the number of pregnancy terminations and attributing it to Governor Kim Reynolds's decision to end participation in a federally funded family planning program. Carver-Kimm alleges that the article was "likely embarrassing" to the Governor.

A few days later, Carver-Kimm was told that due to restructuring, she could choose to resign or have her employment terminated by the State. Carver-Kimm initially chose to have the State terminate her employment, but for reasons having to do with preserving certain accrued employment benefits, she agreed to resign instead. Carver-Kimm alleges that she was terminated "under the authority and/or at the direction of" Clabaugh, Reisetter, and Susan Dixon (a bureau chief within the department handling workforce services). She further alleges that the Governor and Garrett "had the ability to effectuate the decision to terminate [her] employment and had input into or influence over the decision" because Clabaugh, as the department's director, serves at the pleasure of the Governor, and Reisetter and Dixon, in turn, "were obliged to follow the decisions of Clabaugh."

Carver-Kimm filed a lawsuit in September. After two amendments (more on this below), it consists of two counts. Count I alleges a claim for wrongful discharge under Iowa Code section 70A.28 (2020) (colloquially referred to as Iowa's "whistleblower protection statute") against the State of Iowa, the Governor, Garrett, Clabaugh, Reisetter, and Dixon. Count II alleges a common law claim for wrongful discharge in violation of public policy against the State of Iowa, the Governor, and Garrett.

The State, the Governor, and Garrett (but not Clabaugh, Reisetter, and Dixon) filed a motion to dismiss both counts against them for failure to plead a claim for which relief can be granted. *See* Iowa R. Civ. P. 1.421(1)(*f*). The Governor and Garrett argued that because they had no authority to discharge an executive agency employee in Carver-Kimm's role, they can't be liable for wrongful discharge under either legal theory that Carver-Kimm pleaded. The State, the Governor, and Garrett further argue that they can't be liable under Carver-Kimm's wrongful-discharge-in-violation-of-public-policy claim based on Iowa's newly-enacted qualified immunity law and because Iowa's open records statute doesn't support the tort's "public policy" component.

The district court denied the motion to dismiss on all grounds. The State, the Governor, and Garrett sought an immediate appeal under a provision granting such a right in the qualified immunity statute. *See* Iowa Code § 669.14A(4) (2022).

**II. Carver-Kimm's Claim for Wrongful Discharge in Violation of Public Policy.**

**A. Qualified Immunity.**

In their motion to dismiss, the Governor, Garrett, and the State argue that the wrongful discharge tort claim should be dismissed because they possess qualified immunity under Iowa Code section 669.14A(2). (The parties agree that qualified immunity doesn't apply to the wrongful discharge claim under section 70A.28.) The Governor, Garrett, and the State further argue that even if actual immunity from liability doesn't apply in this case, the statute's heightened pleading requirements in section 669.14A(3) should still apply. Because Carver-Kimm's second amended petition failed to meet those pleading requirements, they argue that we must dismiss the claim. The district court held that neither the substantive immunities in subsection (2) nor the procedural requirements in subsection (3) applied to Carver-Kimm's claims.

How, or whether, the qualified immunity statute applies is complicated by the timing of events in this case. A march through the timeline is necessary.

Carver-Kimm resigned from the department on July 15, 2020. She filed her initial petition in September, suing the Governor, Garrett, and the State for wrongful discharge under section 70A.28. On June 4, 2021, she filed a motion to amend her petition to add two more claims against the Governor, Garrett, and the State: count II's claim for wrongful discharge in violation of public policy and a count III for violation of free speech rights under the Iowa Constitution. The district court granted the amendment on June 22.

Carver-Kimm filed a motion to amend her petition for a second time on July 28, which the district court granted on August 11. This second amended petition added some factual allegations to the background facts section, added three new defendants to count I (Clabaugh, Reisetter, and Dixon), and deleted count III (the free-speech constitutional claim). The amendment made no substantive change to count II.

In the midst of all this, the new qualified immunity statute was enacted on June 17, 2021. *See* 2021 Iowa Acts ch. 183, §§ 12, 16 (codified at Iowa Code § 669.14A (2022)). It went into effect that same day. *Id.* § 16. Iowa Code section 669.14A(2) codified a substantive qualified immunity protection that made the state and state agencies immune from liability from certain tort claims. Section 669.14A(3) introduced a heightened pleading requirement for tort claims against the state, requiring plaintiffs to "state with particularity the circumstances constituting the violation and that the law was clearly established at the time of the alleged violation." The statutory remedy is severe: "Failure to plead a plausible violation or failure to plead that the law was clearly established at the time of the alleged violation shall result in dismissal with prejudice." *Id.*

In our recent decision in *Nahas v. Polk County*, we addressed a similar factual scenario in which the defendants' alleged misconduct—and thus the right to pursue a cause of action based on that misconduct—preceded the enactment of a nearly-identical qualified immunity statute covering municipalities. ___ N.W.2d ___, ___, 2023 WL 3906488, at *2, 5 (Iowa June 9, 2023) (applying

Iowa Code § 670.4A (2022)). In analyzing whether the statute's substantive immunity should apply retroactively, we noted that the statute itself didn't provide for retroactive application and that the legally-relevant events that gave rise to the plaintiff's cause of action occurred before the statute was enacted. *Id.* at ___, 2023 WL 3906488, at *4–5. We reasoned that applying the immunity to cover conduct alleged to have occurred before the statute's effective date would strip the plaintiff of a vested right to pursue his cause of action. *Id.* at ___, 2023 WL 3906488, at *4. We thus held that the substantive qualified immunity protections of the statute did not extinguish the cause of action since it had accrued before the statute went into effect. *Id.* at ___, 2023 WL 3906488, at *5.

In this case, the timing of the underlying alleged misconduct and the enactment of the qualified immunity statute are in all relevant respects identical to those in *Nahas*. For all the same reasons we discussed in *Nahas*, the substantive qualified immunity protections in section 669.14A(2) do not apply to Carver-Kimm's wrongful discharge tort claim in this case.

The potential application of the heightened pleading standards from section 669.14A(3) present a more complicated question. In *Nahas*, we separately examined the three pleading requirements that section 670.4A(3) sets forth: (1) to "state with particularity the circumstances constituting the violation;" (2) to plead "a plausible violation" of the law; and (3) to state "that the law was clearly established at the time of the alleged violation." *Id.* at ___, 2023 WL 3906488, at *5 (quoting Iowa Code § 670.4A(3)). Drawing on our reasoning against the retro-

active application of the substantive immunity in section 670.4A(2), we determined that the requirement to plead a violation of clearly established law was "inherently backward-looking" and thus "would be an impermissible retrospective application." *Id.* at ___, 2023 WL 3906488, at *6. But we determined that the separate plausibility and particularity requirements *did* apply to the plaintiff's petition because he filed his initial petition more than three months *after* the qualified immunity statute had been in effect. *Id.* at ___, 2023 WL 3906488, at *5.

But unlike the situation in *Nahas*, Carver-Kimm filed her initial petition almost nine months *before* section 669.14A went into effect. Her first motion to amend, which added count II's claim for the wrongful discharge tort, was similarly filed about two weeks before the statute went into effect. Her second motion to amend was filed about six weeks after the statute went into effect. The State urges that we impose the heightened pleading requirements of section 669.14A, subsection (3) to the second amended petition and then find that Carver-Kimm failed to sufficiently plead the wrongful discharge tort and dismiss the claim.

Setting aside the selective application we're already doing with subsection (3)'s pleading requirements (since we're not applying the clearly-established-law pleading requirement based on retroactivity), the application of subsection (3)'s plausibility and particularity requirements in this peculiar circumstance has more than an air of retroactivity to it. Carver-Kimm included her wrongful discharge tort in count II in her first motion to amend her petition two weeks before the statute's enactment. She made no change to count II (other than updating

incorporated paragraph numbers) in her second amended petition in the weeks after the statute's enactment. On these facts, we believe that the statute imposed no requirement on Carver-Kimm to revise count II in her postenactment amendment to satisfy the plausibility and particularity requirements that were enacted between her first and second amended petitions. We thus reject the State's argument seeking dismissal of count II based on the pleading requirements in section 669.14A(3).

**B. Using Chapter 22 and Public Policy to Support the Wrongful Discharge Tort.**

The State separately argues that we should dismiss Carver-Kimm's cause of action for wrongful discharge in violation of public policy because Iowa's open records statute doesn't provide a "clearly defined public policy" necessary to support her claim.

Iowa generally adheres to the employment-at-will doctrine. *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011). Under this doctrine, unless a contract states otherwise, generally the employee or the employer may end the employment "at any time, for any reason, or no reason at all." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (en banc) (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)). But we've recognized a narrow exception to the doctrine when an employee is fired for reasons that violate a "clearly defined public policy." *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009). Our precedents have recognized this tort in three circumstances: (1) when an employee is discharged "in retaliation for enforcing a statutory right"; (2) when an employee is discharged for "refus[ing] to participate in

an illegal activity"; and (3) when an employee is discharged for whistleblowing "by reporting illegalities in the workplace." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300–04 (Iowa 2013).

An employee pursuing a claim for wrongful discharge in violation of public policy must establish four elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Berry*, 803 N.W.2d at 109–10. The first two elements involve questions of law for the court to decide. *Fitzgerald*, 613 N.W.2d at 282.

Carver-Kimm alleges that she was wrongfully discharged "after she made repeated efforts to comply with Iowa's Open Records law (Chapter 22) by producing documents and information to local and national media." We have said that the tort provides a remedy for conduct that violates public policy established in a statute. *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560–61 (Iowa 1988) (en banc). She argues that Iowa Code chapter 22 provides a clearly-defined and well-recognized public policy that has been undermined by her discharge, and that to find a clear declaration of the public policy supporting her claim in this case, we need to look no further than the statute's own language: "[T]he policy of this chapter [is] that free and open examination of public records is generally in the public interest even though such examination may cause inconvenience or embarrassment to public officials or others." Iowa Code § 22.8(3).

We have long recognized the public policy furthered by compliance with our open records statute. In *City of Riverdale v. Diercks*, we described the purpose of our open records statute was "to open the doors of government to public scrutiny [and] to prevent government from secreting its decision-making activities from the public, on whose behalf it is its duty to act." 806 N.W.2d 643, 652–53 (Iowa 2011) (alteration in original) (quoting *Rathmann v. Bd. of Dirs.*, 580 N.W.2d 773, 777 (Iowa 1998)). And just this term, we again recognized the statute's role in the oversight of our state and its officials, holding that an unreasonable delay in responding to an open records request can constitute a violation of the statute. *Belin v. Reynolds*, 989 N.W.2d 166, 175 (Iowa 2023). We declared such an interpretation was "consistent with the legislature's stated policy, namely, to encourage the 'free and open examination of public records.' " *Id.* (quoting Iowa Code § 22.8(3)).

We agree with the State that the broad declaration as to what is "generally in the public interest" in Iowa Code section 22.8(3) is too general to serve as the basis for a wrongful discharge claim. *See Dorshkind*, 835 N.W.2d at 303 (noting that "[w]e cautiously identify policies to support an action for wrongful discharge" and avoid reliance on "generalized concepts of fairness and justice" (quoting *Fitzgerald*, 613 N.W.2d at 283)); *see also Lloyd v. Drake Univ.*, 686 N.W.2d 225, 230–31 (Iowa 2004) (rejecting the claim of a security guard who was fired after forcibly restraining a student suspected of assault because a public policy against crime "is far too generalized to support an argument for an exception to the at-will doctrine"). In Carver-Kimm's view, if she was fired or her job duties

were changed because she had done anything that, in a jury's view, furthered the general policy stated in section 22.8(3), she can sue for tort damages. That position is untenable and inconsistent with our precedent. If Carver-Kimm's position were correct, then a department spokesperson would have absolute job protection whenever they told or gave the media anything so long as the information could be traced to a public record. That could lead to chaos in state government. A department spokesperson would become the person who gets to *decide* the department's message, permanently, instead of the person who merely *delivers* it.

At the same time, we disagree with the State that nothing in chapter 22 can support a wrongful-discharge-in-violation-of-public-policy claim. When Carver-Kimm was the custodian of records at the department, she was under a statutory duty to fulfill proper requests for public records. *See* Iowa Code 22.3(1); *Belin*, 989 N.W.2d at 174–75. If Carver-Kimm was discharged for complying with that duty—which is what she alleges in her petition—those circumstances could support a claim. *See Dorshkind*, 835 N.W.2d at 301 (discussing cases where the plaintiff was discharged for refusing to participate in illegal activity); *Fitzgerald*, 613 N.W.2d at 286–87 (holding that a plaintiff who was discharged because he intended to testify truthfully in a legal proceeding rather than perjure himself had a claim); *see also Davis v. Bd. of Educ.*, No. 19 C 4293, 2020 WL 1848205, at *7 (N.D. Ill. Apr. 13, 2020) (denying a motion to dismiss a whistleblower-protection claim where the plaintiff alleged retaliatory discharge after refusing to

participate in covering up his supervisor's directive to unlawfully withhold documents from a FOIA-request response).

The State also argues that we should decline to recognize a public employee's mandatory compliance with open records laws as the "public policy" supporting the tort because chapter 22 contains a separate enforcement mechanism for parties requesting records from government bodies. *See* Iowa Code § 22.10 (allowing for judicial enforcement of chapter 22 provisions). We're unconvinced. The fact that a party can request records (and go to court if the records aren't produced) doesn't prevent undermining of the open-records objective if the employee statutorily required to produce those records is fired for doing so. *See Berry*, 803 N.W.2d at 109–10. In *Ferguson v. Exide Technologies, Inc.*, we said that "when the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary." 936 N.W.2d 429, 434–35 (Iowa 2019) (per curiam). But that's not the situation in this case. Failing to recognize the wrongful discharge tort in this case would put at risk the open records law's implementation, which depends in large part on the lawful custodian being able to perform the tasks imposed on them by chapter 22.

On this point, *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d 275, is instructive. In that case, the plaintiff was fired for refusing to lie under oath to protect his employer. *Id.* at 285. We recognized his claim for wrongful discharge

in violation of public policy to protect employees from firing for refusing to commit an unlawful act (namely, perjury) or performing a statutory obligation (namely, testifying truthfully). *Id.* at 286. Both actions have alternative enforcement mechanisms—people can be criminally prosecuted for perjury, suborning perjury, or witness tampering—yet we recognized the tort based on this public policy even though a different mechanism also partially addressed the problem. *Id.*

Likewise, in *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, we held that an employee who was discharged for making an *internal* report of illegal conduct had a valid claim for wrongful discharge in violation of public policy even though the employee had a clear statutory remedy: making an *external* report to the department of inspections and appeals. 835 N.W.2d at 316 (Mansfield, J., concurring in part and dissenting in part); *see also* Iowa Code § 231C.7(1). Employees who make external reports are protected by statute from retaliation. *See* 835 N.W.2d at 316; *see also* Iowa Code § 231C.13.

And in *Tullis v. Merrill*, we sustained a wrongful-discharge-in-violation-of-public-policy claim brought by an employee who was terminated for complaining about the employer's nonpayment of benefits even though the employee clearly had other remedies, such as making a statutorily-protected complaint to the labor commissioner for resolution or suing the employer for the unpaid benefits. 584 N.W.2d 236, 239–40 (Iowa 1998). All these cases would have been resolved differently if the State and our partially dissenting colleagues were right about the law.

The question isn't simply whether *some* remedy exists for *someone* that advances the public policy at issue, but whether a remedy exists to address the wrong associated with firing an employee against clearly defined public policy. *Berry*, 803 N.W.2d at 110. In *Berry v. Liberty Holdings, Inc.*, we elaborated on the point this way:

> The statute relied upon must relate to the public health, safety, or welfare and embody a clearly defined and well-recognized public policy that protects the employee's activity. Stated another way, the source from which an employee seeks to derive a public policy "must affect a public interest so that the tort advances general social policies, not . . . individual interests."

*Id.* at 110 (omission in original) (citations omitted) (quoting *Jasper*, 764 N.W.2d at 766). The source of the claim that Carver-Kimm alleges in this case is the public's statutory right to access records from the Iowa Department of Public Health. Protecting this right by recognizing a cause of action for an employee tasked with carrying out the statute advances a well-recognized general social policy. *See Bradford v. Huckabee*, No. 4:02CV00429GH, 2002 WL 35646237, at *5 (E.D. Ark. Oct. 18, 2002) (denying a motion to dismiss a fired state employee's civil conspiracy claim based on his allegation that the defendants conspired to have him violate state and federal FOIA laws), *rev'd in part on other grounds after remand*, 394 F.3d 1012 (8th Cir. 2005); *Crowley v. Watson*, 51 N.E.3d 69, 77 (Ill. App. Ct. 2016) (affirming a jury's verdict in favor of a fired state employee on a statutory claim "analogous to the tort of retaliatory discharge . . . in violation of a clear public policy" where the employee had refused to withhold documents in response to a FOIA request that were embarrassing to the university's president); *see also Stover v. Louisville Metro Dep't of Pub. Health & Wellness*, No. 2018–CA–

000054–MR, 2019 WL 258123, at *4 (Ky. Ct. App. Jan. 18, 2019) (concluding that "to the extent [the municipal employee] was discharged on the basis of his exercise of" rights under Kentucky's Open Records Act, "his discharge is so contrary to public policy as to be actionable -- were it not for sovereign immunity, that is").

A wrongful-discharge-in-violation-of-public-policy claim isn't some redundant protection. What if, for instance, a lawful custodian is told by their boss that if they produce some embarrassing records, they'll be fired? Without legal protection for the custodian in this circumstance, it's likely that the records will never be produced—and the records' existence will never be known to the requesting party. The proper functioning of the Open Records Act depends on the government employees who administer it, and the wrongful-discharge-in-violation-of-public-policy tort protects those employees.

The very point of the wrongful-discharge-in-violation-of-public-policy tort is to protect employees from being fired when that protection is necessary to vindicate *some other* legal mandate, whether it be the statutory duty to testify truthfully, the statutory duty to keep honest records, or the statutory duty to pay employee benefits when due. *See Fitzgerald*, 613 N.W.2d at 287–88; *Dorshkind*, 835 N.W.2d at 301 (majority opinion); *Tullis*, 584 N.W.2d at 239–40. It would dramatically narrow that tort to say that the other legal mandate is *itself*

a sufficient remedy that eliminates the need for the tort. We crossed that bridge long ago.[1]

Yet we emphasize again the "narrow" scope of the wrongful-discharge-in-violation-of-public-policy claim. *See Dorshkind*, 835 N.W.2d at 311 (Mansfield, J., concurring in part and dissenting in part) (citing the numerous times we have said that this exception to employment-at-will is a "narrow" one). Carver-Kimm worked for the department, and on the whole, the department was entitled to determine the message that it wanted to convey to the press and public. In her petition, Carver-Kimm raises concerns about being stripped of the responsibility for handling press releases and media inquiries and, at some point, open records requests. Then she alleges that she was fired after she responded to a media inquiry when that was no longer part of her job. These matters by themselves would not support a wrongful-discharge-in-violation-of-public-policy claim because it is necessary for Carver-Kimm to show that she was discharged in retaliation for providing, or indicating she would provide, public records she was under a legal obligation to provide.

---

[1]Our colleagues' citations to out-of-state authorities are unpersuasive because the cases are nonprecedential, distinguishable, or both. For example, *Shero v. Grand Savings Bank* involved an employee of a bank who was terminated allegedly because he pursued an open-records claim against a public entity that was a customer of the bank. 161 P.3d 298, 299 (Okla. 2007). The court emphasized, "Employee was not ordered to perform an illegal act or denied an opportunity to exercise his legal rights such that might serve as public policy grounds giving rise to liability for an at-will employee's discharge." *Id.* at 302. And *Antley v. Shepard* involved a county employee who argued her discharge should be set aside because the county's underlying policy regarding the hearing of appeals—including the appeal of her termination—had been developed in violation of South Carolina's freedom of information act. 532 S.E.2d 294, 296 (S.C. Ct. App. 2000), *aff'd as modified*, 564 S.E.2d 116 (S.C. 2002) (per curiam). The court noted that the plaintiff in that case "d[id] not argue she was terminated for exposing FOIA violations," and the court thus "d[id] not address whether such a termination would give rise to a cause of action under the public policy exception." *Id.* at 299 n.2.

Our partially dissenting colleagues mischaracterize the scope of today's holding. We are not holding that Carver-Kimm has a cause of action if "she resigned in lieu of termination after producing records she no longer had the statutory responsibility or authority to produce." We are not saying that "lawful custodians must allow any employee to produce records, even when the employee has been relieved of the legal responsibility or authority to do so." Carver-Kimm can maintain a cause of action if, and only if, she can show she was terminated for complying with her statutory duty as lawful custodian to produce records that she had an obligation to produce.

But this appeal comes to us on a motion to dismiss, and we have a liberal pleading standard in Iowa. *See Benskin, Inc. v. West Bank*, 952 N.W.2d 292, 307 (Iowa 2020). Reading all the allegations as a whole, it is possible that Carver-Kimm will be able to prove that she was actually terminated for carrying out her mandatory legal duty when she was the department's records custodian to produce records responsive to an open records request. If the State discharged Carver-Kimm for that reason, her discharge "would have a chilling effect on other employees by discouraging them from engaging in similar conduct." *Fitzgerald*, 613 N.W.2d at 288. We thus affirm the district court's ruling denying the State's motion to dismiss on this ground.

### C. Authority to Discharge.

Carver-Kimm argues that the Governor and Garrett fall within the scope of liability for her wrongful discharge claim. She cites primarily to two cases, *Rumsey v. Woodgrain Millwork. Inc.* and *Jasper v. H. Nizam, Inc.*, to assert that

liability is not limited to supervisors or those with decision-making authority for a firing, but to anyone who has personal influence or input into the decision. *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 36 (Iowa 2021); *Jasper*, 764 N.W.2d at 761.

In *Rumsey*, a fired employee who was deaf sued his former employer for wrongful discharge based on alleged disability discrimination under the Iowa Civil Rights Act. 962 N.W.2d at 19. The case required us to examine whether the plaintiff's claim for wrongful discharge could proceed against two other employees who had encouraged the employer's director of human resources to fire the plaintiff even though the two were not his supervisors and lacked independent power to fire him. *Id.* at 33–34.

We focused on the text of the Iowa Civil Rights Act, which makes it a discriminatory practice for "[*a*]*ny person* to . . . retaliate against another person in any of the rights protected against discrimination." *Id.* at 34–35 (omission in original) (emphasis added) (quoting Iowa Code § 216.11(2)). Iowa Code section 216.11(1) draws a wider circle still, making it a discriminatory practice "to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter." In permitting the plaintiff's claims to proceed against the two nonsupervisory employees, we interpreted the Act's language to impose liability based "not on the individual's title or generalized authority over employment decisions but on the individual's personal involvement and ability to bring about the challenged discriminatory action." *Rumsey*, 962 N.W.2d at 36. "[I]t is the individual's ability to effectuate the adverse

employment action at issue," we said, "that can subject them to personal liability." *Id.*

But as the State emphasizes, the wrongful discharge claim in *Rumsey* is a statutory claim alleging a violation of the Iowa Civil Rights Act and its particular language. Carver-Kimm alleges no Iowa Civil Rights Act violation; hers is a common law tort claim. We have never declared that the wrongful discharge tort mirrors an Iowa Civil Rights Act claim. And more particularly, we have never determined that the scope of liability in the Iowa Civil Rights Act also applies to the common law tort, and we see no need to do so in this case. Carver-Kimm's citation to *Rumsey* and other cases applying the Iowa Civil Rights Act thus doesn't answer whether liability under the wrongful discharge tort extends to the Governor or her staff.

In the other case that Carver-Kimm principally cites for support on this point, *Jasper,* we analyzed an employee's tort claim for wrongful discharge in violation of public policy against a closely-held corporation (a day-care facility named "Kid University") and the corporation's president (a man named "Hussain"). 764 N.W.2d at 776. The case presented a question of first impression about whether a corporate officer could be held personally liable, as opposed to a claim available only against the corporate entity. *Id.* at 774. We held that corporate officers could be held personally liable even when acting in their official corporate capacity, reasoning that because "the tort is directed at the reasons behind the discharge [and] not the discharge itself, the type of authority exer-

cised by the person who carries out the discharge for violations that violate public policy is largely irrelevant." *Id.* at 776. "[T]he corporate structure," in other words, "will not insulate individual officers and employees authorized to make discharge decisions from liability for the underlying tortious conduct in exercising that authority." *Id.*

Carver-Kimm asks us to draw an analogy between a corporate officer's power to manage and direct a corporation and the Governor's power to manage and direct state government. But that analogy doesn't take us as far as Carver-Kimm supposes. Unlike a business entity, which can take on any number of decisional and operational structures, Iowa law imposes a defined structure for many state administrative agencies, including the Iowa Department of Public Health. *See* Iowa Code ch. 135.

The department is a creature of statute. The statute requires the governor to appoint a director of the department. *See id.* § 135.2(1)(*a*). And the director "shall be the head of the 'Iowa Department of Public Health.' " *Id.* § 135.11. The statute commands that "[t]he director shall employ such assistants and employees as may be authorized by law, and the persons appointed shall perform duties as may be assigned to them by the director." *Id.* § 135.6. The power to appoint "comes with removal authority unless the law otherwise provides." *Bribriesco-Ledger v. Klipsch,* 957 N.W.2d 646, 652 (Iowa 2021). But no statute or constitutional provision gives a governor (or a member of the governor's staff) authority to appoint or remove a department employee such as Carver-Kimm.

In *Jasper,* we declined "to decide how deep the tort could reach in the corporate chain of management in a particular situation." 764 N.W.2d at 776. In that case, the authority of the corporate officer to fire employees was clear-cut: "Hussain was essentially Kid University," both authorizing and directing the corporation's decision-making and, specifically, the decision to terminate the plaintiff. *Id.* The same can't be said in this case. As a matter of law, the Governor and Garrett lacked the power to discharge Carver-Kimm from her job within the Iowa Department of Public Health. The power to appoint or remove Carver-Kimm resided with the director. The "individual officers and employees *authorized* to make discharge decisions" are not immune from liability "for the underlying tortious conduct in exercising *that authority.*" *Id.* (emphasis added). Because neither the Governor nor Garrett was authorized to make discharge decisions involving Carver-Kimm, *Jasper* offers no basis to hold them liable for her wrongful discharge.

Carver-Kimm alleges in her petition that the Governor and Garrett "directed, influenced, authorized, and/or had input into the decision" to fire her. Although we accept the *factual* assertions in a petition as true when ruling on a motion to dismiss, we do not likewise accept as true a petition's *legal* assertions. *Benskin, Inc.,* 952 N.W.2d at 298. Whether the Governor and Garrett had authority for hiring and firing within the department of public health can be determined as a matter of law. And the statute tells us that the power resides with the director, not with the Governor or members of her staff. *See* Iowa Code §§ 135.2, .6.

Carver-Kimm invites us to widen the net of liability for the wrongful discharge tort to include people who "influenced" or "provided input" into the discharge, even if they lacked the authority to make the decision. In the thirty-five years since we first recognized the tort in *Springer v. Weeks & Leo Co.*, 429 N.W.2d at 560, we have never extended it to include liability to those without authority to discharge the plaintiff employee. We decline the invitation to do so today.

Carver-Kimm argues that it "suspends reality" for the Governor to claim that she lacks the power to "directly order or indirectly influence or persuade a department head to terminate a troublesome employee." But the inquiry must return to the source of this claimed power. Even Carver-Kimm acknowledges that she was terminated "under the authority and/or at the direction of Clabaugh, Reisetter, and/or Dixon." Broad statements about the Governor's constitutional power to "transact all executive business with the officers of government," Iowa Const. art. IV, § 8, or the statutory power to direct "efficient and economical administration of all departments and establishments of the government," Iowa Code § 8.3(2), as Carver-Kimm recites, don't generate the authority she invites. The power to hire and fire *within the department* is spelled out by statute. It is specific in what it grants, and *to whom. See* Iowa Code § 135.6. General language about a governor's executive powers over hiring and firing decisions must give way to the specific grant of power that *the law* vests in the department's director. We cannot confuse political accountability with legal liability.

A cause of action against those who possessed authority to wrongfully discharge an employee in violation of public policy, and who then did so, should generally provide a victim with adequate opportunity for redress of this tort. While the facts could show that others below the director within the department's chain of command exercised authority for the firing, the highest rung on the ladder that Carver-Kimm's claim can reach is the department's director. The statute grants neither the Governor nor Garrett the power to authorize or compel Carver-Kimm's firing, leaving the wrongful discharge tort alleged against them without a legal anchor. And without a legal basis to impose liability against them, Carver-Kimm's wrongful discharge tort claims against each cannot proceed. We thus dismiss the claim of wrongful discharge in violation of public policy against both the Governor and Garrett. *See* Iowa R. Civ. P. 1.421(1)(*f*).

The wrongful discharge tort claim against the State involves a different analysis. In count II of her petition, Carver-Kimm alleges that "the State of Iowa" wrongfully discharged her and that "[a]s a result of the actions of the State of Iowa, its agents, servants and employees," she has suffered damages. The allegations against the State obviously do not come with the lack-of-authority problems that we addressed above. We thus affirm the district court's denial of the motion to dismiss the wrongful discharge tort claim pleaded against the State.

**III. Carver-Kimm's Claim of Wrongful Discharge Under Section 70A.28.**

The Governor, Garrett, and the State argue that the district court similarly erred in failing to dismiss Carver-Kimm's claim for wrongful discharge under

section 70A.28, colloquially referred to as Iowa's "whistleblower protection stat-ute." The statute states in relevant part:

> A person shall not discharge an employee from or take or fail to take action regarding an employee's appointment or proposed appoint-ment to, . . . or any advantage in, a position in a state employment system administered by . . . a state agency as a reprisal for . . . a disclosure of information to a person providing human resource management for the state . . . if the employee, in good faith, reason-ably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

*Id.* § 70A.28(2).

This is our first case addressing a question about the scope of liability for a wrongful discharge claim under section 70A.28. Carver-Kimm argues that we should find liability to extend "at least as broad as individual liability under the Iowa Civil Rights Act." Relying heavily, once again, on our opinion in *Rumsey*, she argues that we should find liability under section 70A.28 extends to anyone having personal influence or input into her discharge decision, including (as she alleges) the Governor and Garrett.

But giving identical treatment to the two statutes, as she urges, creates problems for her when we compare the text of section 70A.28 with the text of the Iowa Civil Rights Act. For instance, the Iowa Civil Rights Act makes it an unlaw-ful practice not only "to discharge" an employee for unlawful reasons but also "to *otherwise discriminate* in employment against" the employee. Iowa Code § 216.6(1)(*a*) (emphasis added). Likewise, the Iowa Civil Rights Act makes it a discriminatory practice "to intentionally aid, abet, compel, or coerce another per-

son to engage in" unlawful discrimination. *Id.* § 216.11(1). Section 70A.28 contains none of this language. The Iowa Civil Rights Act, in describing the class of people potentially liable, uses the "[*a*]*ny* person" language discussed above. *Id.* §§ 216.6(1)(*a*); .11 (emphasis added). But section 70A.28(2) refers to "[*a*] person." We find that Carver-Kimm's citation to *Rumsey* and its application of the Iowa Civil Rights Act offers little to guide us on how far liability extends under section 70A.28's distinct text.

But we need not settle the precise boundaries of liability under section 70A.28 in this case. The petition lays bare the basis for Carver-Kimm's claim under section 70A.28: wrongful discharge. We start with the heading of count I to her petition, which is captioned "Wrongful Discharge In Violation of Iowa Code Section 70A.28." In this count, Carver-Kimm alleges that her disclosures to a human resources manager about misconduct in the department's operations during the pandemic "were a cause of Defendants' decision to strip her of her duties and *terminate her employment.*" (Emphasis added.) She further alleges that "[t]he actions and conduct of [the Governor], Garrett, Clabaugh, Reisetter and/or D[ixon] *in terminating* [*her*] *employment* constitutes a simple misdemeanor under Iowa Code § 70A.28(4)." (Emphasis added.) And driving home the point, the petition includes two paragraphs detailing the alleged unlawful acts of the Governor and Garrett specifically:

> 29A. Upon information and belief, Defendants Reynolds and Garrett had the ability to effectuate *the decision to terminate* Plaintiff's employment and had input into or influence over *the decision to terminate* Plaintiff. Defendant Clabaugh served at the pleasure of Defendant Reynolds, giving Reynolds—and Garrett as a member of

Reynolds' cabinet—considerable sway over Clabaugh's decisions. In turn, Reisetter and Dixon were obliged to follow the decisions of Clabaugh.

29B. Upon information and belief, Defendants Reynolds and Garrett directed, influenced, authorized and/or had input into *the decision* [*to*] *terminate* [Carver-Kimm's] employment.

(Emphases added.)

Stated simply, Carver-Kimm's petition alleges a claim against the Governor and Garrett for wrongful discharge. And were we to construe section 70A.28 as Carver-Kimm urges—making it an unlawful act to influence or provide input into a discharge—she would have a viable claim. But we are bound by the statute's text, and the key language for our purposes is unambiguous: "[a] person shall not *discharge* an employee" as a reprisal for disclosing information. Iowa Code § 70A.28(2) (emphasis added). We interpret the text to require that a defendant *discharge* an employee before a plaintiff can recover under the statute. And as we discussed above, neither the Governor nor Garrett had the power, as a matter of law, to discharge Carver-Kimm. *See* Iowa Code §§ 135.2, .6. As a result, Carver-Kimm's section 70A.28 claims against the Governor and Garrett cannot proceed. We thus reverse the district court's decision and dismiss the claims against them.

The district court denied the motion to dismiss the section 70A.28 claim against the State, stating that "at the hearing on this motion defendants conceded that with the addition of Clabaugh, Reisetter, and Dixon as defendants[,] count I should proceed whether the State is a proper named party or not. . . . As

such, the court concludes the State will not be dismissed from count I by agreement of the parties." The State doesn't challenge the district court's order on this issue on appeal. We thus leave it alone.

**IV. Conclusion.**

We affirm the district court's ruling denying the motion to dismiss the claims against the State. But we reverse the ruling denying the motion to dismiss Carver-Kimm's claims against the Governor and Garrett for wrongful discharge under section 70A.28 (count I) and wrongful discharge in violation of public policy (count II), and thus dismiss the Governor and Garrett from the case. The case is remanded for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christensen, C.J., Waterman, and Mansfield, JJ., join this opinion. McDonald, J., files an opinion concurring in part and dissenting in part, in which Oxley and May, JJ., join.

**McDONALD, Justice (concurring in part and dissenting in part).**

I concur in all parts of the majority opinion except its resolution of Carver-Kimm's claim for wrongful discharge in violation of public policy. The wrongful discharge claim is a narrow exception to the employment-at-will doctrine. Our precedents dictate that this court not imply a cause of action for wrongful discharge in violation of public policy unless the cause of action is necessary to enforce or vindicate the public policy. Our precedents also dictate that where the statute evidencing the public policy at issue provides a mechanism for its vindication or enforcement, this court should not create an additional cause of action for wrongful discharge. The state open records law, Iowa Code chapter 22, evidences a public policy in favor of public access to public records, but the Code sets forth a comprehensive scheme for the public to vindicate or enforce the policy. Under our precedents, this court should not create an additional enforcement mechanism the legislature declined to provide. Further, there are countervailing reasons to not imply a cause of action for wrongful discharge here. Iowa Code chapter 22 carefully balances the public's right to access public records with the government's duty to protect confidential records. Adding an implied cause of action to the legislature's comprehensive scheme tips that balance. I would reverse the district court and dismiss Carver-Kimm's claim for failure to state a claim upon which relief could be granted.

In Iowa, "[a]bsent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-

will." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (en banc). "This means the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.' " *Id.* (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)).

In *Springer v. Weeks & Leo Co., Inc.*, this court adopted a limited exception to the employment-at-will doctrine by creating an implied cause of action for wrongful discharge where an employer terminates an employee in violation of a clearly established public policy. 429 N.W.2d 558, 559 (Iowa 1988) (en banc). Since *Springer*, this court has repeatedly emphasized that a claim for wrongful discharge in violation of public policy is narrowly circumscribed and that the court should proceed cautiously before creating an implied cause of action. *See, e.g., Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa 2013) ("The narrow public-policy exception to the at-will employment doctrine 'limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state.' " (quoting *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011))); *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303 (Iowa 2013) ("Thus, the exception is narrowly circumscribed to only those policies clearly defined and well-recognized to protect those with a compelling need for protection from wrongful discharge."); *id.* at 311 (Mansfield, J., concurring in part and dissenting in part) ("Previously, we said on many occasions that the public-policy exception in Iowa is a 'narrow' exception to employment at will."); *Berry*, 803 N.W.2d at

109 (describing the tort as a "narrow" exception to general rule of at-will employ-ment); *Ballalatak v. All Iowa Agric. Ass'n*, 781 N.W.2d 272, 275 (Iowa 2010) (stat-ing the tort is a "narrow exception" to employment-at-will doctrine); *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009) ("[T]he tort of wrongful dis-charge should exist in Iowa only as a narrow exception to the employment-at-will doctrine."); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 229 (Iowa 2004) (stating we must proceed with caution before creating an implied cause of action); *Da-vis v. Horton*, 661 N.W.2d 533, 536 (Iowa 2003) (stating we must "proceed cau-tiously"); *Fitzgerald*, 613 N.W.2d at 283 ("Thus, we must proceed cautiously when asked to declare public policy to support an exception to the at-will doc-trine."); *Phipps*, 558 N.W.2d at 202 (stating the tort is a "narrow exception"); *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 220 (Iowa 1996) (same); *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 282 (Iowa 1995) (describing retaliatory discharge claims as "narrow deviation[]" from general at-will-employment doc-trine).

Because we must proceed cautiously when determining whether to create a wrongful discharge claim, it is not enough for this court to rely on "generalized concepts of fairness and justice." *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 686 (Iowa 2001). Nor is it enough for this court to merely identify a statute evi-dencing a public policy; presumably, all statutes are enacted to advance some public policy. Instead, this court will imply a cause of action for wrongful dis-charge only where the cause of action is necessary to enforce or vindicate the public policy or right at issue. *See Berry*, 803 N.W.2d at 109. An implied cause

of action is unnecessary and improper where the legislature provides a scheme to enforce or vindicate the public policy at issue. *See Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156 (Iowa 1996) ("We note and approve the following variation of the rule: 'Where the legislature has provided a comprehensive scheme for dealing with a specified kind of dispute, the statutory remedy provided is generally exclusive.' " (quoting 1A C.J.S. *Actions* § 14 n.55 (1985))).

An implied cause of action for wrongful discharge is unnecessary and precluded here because the open records law itself contains a comprehensive and robust enforcement scheme. "Any aggrieved person . . . may seek judicial enforcement of the requirements of [the open records law] in an action brought against the lawful custodian and any other persons who would be appropriate defendants under the circumstances." Iowa Code § 22.10(1). The statute provides numerous forms of relief for any violation of the law. The court may (1) issue an injunction ordering compliance with the chapter, (2) award damages of between $100–$500 against those who participated in the violation, (3) award damages of between $1,000–$2,500 against those who knowingly participated in the violation, (4) award costs and attorney fees, and (5) "issue an order removing a person from office if that person has engaged in a prior violation of this chapter for which damages were assessed." *Id.* § 22.10(3)(*a*)–(*d*).

In addition to the statutory authorization of private suits to enforce the open records law, Iowa Code chapter 23 "provide[s] an alternative means by which to secure compliance with and enforcement of the requirements of" the law through an administrative proceeding before the Iowa Public Information

Board. *Id.* § 23.1. Pursuant to chapter 23, a person denied access to government records can file a complaint with the public information board. *Id.* § 23.8. "[T]he board shall promptly work with the parties, through employees of the board, to reach an informal, expeditious resolution of the complaint." *Id.* § 23.9. When the board finds a violation of Iowa Code chapter 22, it can take remedial action. *See id.* § 23.10(3)(*a*)–(*b*). "It can require the respondent to pay statutory damages . . . to the extent that damages would be payable if the complainant had gone to court instead." *Klein v. Iowa Pub. Info. Bd.*, 968 N.W.2d 220, 230 (Iowa 2021).

Our cases hold that creating an implied cause of action for wrongful discharge in violation of public policy is improper where, as here, the very statute evidencing the public policy also contains an enforcement provision:

> In keeping with the original purpose of the common law action, when the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary. In this situation, the "legislature has weighed in on the issue and established the parameters of the governing public policy." *Harvey*, 634 N.W.2d at 686. If the legislature considers the remedies it has provided inadequate, it is free to modify them. However, we need not provide an alternative court remedy when the legislature already provided one. **Thus, we hold that when a civil cause of action is provided by the legislature in the same statute that creates the public policy to be enforced, the civil cause of action is the exclusive remedy for violation of that statute.**

*Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 434–35 (Iowa 2019) (per curiam) (emphasis added); *see also Ackerman v. State*, 913 N.W.2d 610, 623 (Iowa 2018) (Waterman, J., dissenting) ("But we have never recognized a common law claim for wrongful discharge in violation of public policy when a statute, indeed the same statute providing the source of the public policy, also codifies a statutory

right of action."); *Harvey,* 634 N.W.2d at 686 ("We must refrain from extending protection to workers from unfair treatment after our legislature has weighed in on the issue and established the parameters of the governing public policy."). Under our controlling precedents, this court is precluded from supplementing the legislature's multi-chapter, comprehensive statutory regime by creating another cause of action the legislature chose not to enact.

The majority's response to this is wholly circular: without recognizing a tort for wrongful discharge in violation of public policy, no "remedy exists to address the wrong associated with firing an employee against clearly defined public policy." In other words, according to the majority, whenever an employee alleges she has been terminated in violation of public policy, the court must create a cause of action for wrongful discharge in violation of public policy if the statute itself does not contain a tort for wrongful discharge in violation of public policy. Beyond being circular, this reasoning is contrary to our precedents. The majority's rationale transforms the tort from a narrow exception to the default rule whenever the relevant statute does not contain a private cause of action for wrongful discharge.

Respectfully, the majority goes astray by failing to clearly define the public policy or right at issue. The majority essentially redefines the public policy here as the employee's right to maintain employment and concludes the employee needs a remedy to vindicate that right. But the public policy here is not the right to maintain employment. The public policy here is the right of requestors to obtain public records. The precise nature of the public policy or right is of critical

importance here. In most of our cases involving the tort of wrongful discharge, the public policy at issue is one related to employment where only the employee has the ability to detect a violation of the public policy, the capacity to seek compliance with the public policy, and the incentive to enforce the public policy. *See, e.g., Fitzgerald*, 613 N.W.2d 275 (right not to commit a crime); *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296 (Iowa 1998) (mandatory reporting of child abuse); *Tullis v. Merrill*, 584 N.W.2d 236 (Iowa 1998) (wage demands); *Lara v. Thomas*, 512 N.W.2d 777 (Iowa 1994) (unemployment compensation); *Springer*, 429 N.W.2d 558 (workers' compensation). In those cases, the public policy tort is necessary to vindicate the policy. That is not the case here. The open records law allows any person to request and obtain public records. Iowa Code § 22.2(1). The requestor will know whether the legal custodian complied with the records request. The requestor has the capacity and incentive to bring suit to enforce the open records law. And the legislature, in two different provisions of the Iowa Code, created comprehensive and robust mechanisms for the requestor to enforce or vindicate the public policy. The creation of the tort is wholly unnecessary to advance the public policy at issue in this case: public access to public records.

*Belin v. Reynolds*, 989 N.W.2d 166 (Iowa 2023), demonstrates the power and effectiveness of chapter 22's statutory enforcement mechanism absent an additional tort remedy. In that case, the question presented was whether chapter 22 allowed the plaintiffs to sue when the lawful custodian merely delayed in

producing requested records. *Id.* at 167, 172. The defendants argued that chapter 22 does not contain a timeliness requirement. *Id.* at 172. We disagreed. *Id.* at 174. We held that unreasonable delay can constitute a violation of the law, and we allowed the requesters' claim for damages under chapter 22 to proceed. *Id.* Our precedents provide that this court should imply a cause of action for wrongful discharge only where necessary to enforce the public policy at issue. *Belin* demonstrates the implied tort is not necessary here.

For these and similar reasons, other courts also conclude there is no implied cause of action for wrongful discharge relating to open records laws. *See, e.g.*, *Gills v. City of New London*, KNLCV206047731S, 2021 WL 5112985, at *2 (Conn. Super. Ct. Oct. 15, 2021) (dismissing wrongful termination claim based on freedom of information act); *Watson v. Cuyahoga Metro. Hous. Auth.*, No. 99932, 2014 WL 1513455, at *11 (Ohio Ct. App. Apr. 17, 2014) (declining to recognize tort because "pursuit of public records is protected by the remedies set forth in the act"); *Shero v. Grand Sav. Bank*, 161 P.3d 298, 302–03 (Okla. 2007) (holding allowing open records law to form basis of tort "would result in an expansion of the [termination in violation of public policy] tort exception beyond the tightly circumscribed framework within which it was designed"); *Antley v. Shepherd*, 532 S.E.2d 294, 299 (S.C. Ct. App. 2000) ("She cannot, however, rely on the alleged [Freedom of Information Act (FOIA)] violations to seek damages for her termination."), *aff'd as modified*, 564 S.E.2d 116 (S.C. 2002) (per curiam); *Kiefer v. Town of Ansted*, No. 15–0766, 2016 WL 6312067, at *3 (W. Va. Oct. 28, 2016) (affirming grant of summary judgment on wrongful termination claim in

alleged violation of freedom of information act). To the best of my knowledge, no court has allowed an implied cause of action for wrongful discharge related to an open records law.

The majority cites several cases in support of their creation of a tort, but none actually support the majority's position. In *Davis v. Board of Education,* the plaintiff brought a statutory whistleblower claim and a retaliatory discharge claim for refusing to conceal alleged FOIA violations during an internal investigation. No. 19 C 4293, 2020 WL 1848205, at *2 (N.D. Ill. Apr. 13, 2020). In *Bradford v. Huckabee,* the district court dismissed the plaintiff's claim for wrongful discharge but allowed the plaintiff to proceed on a civil conspiracy claim where the plaintiff also alleged a claim for wrongful discharge under the statutory whistleblower act. No. 4:02CV00429GH, 2002 WL 35646237, at *4–5 (E.D. Ark. Oct. 18, 2002). In *Crowley v. Watson,* the court affirmed a jury's verdict for a statutory wrongful discharge claim arising under the "Illinois State Officials and Employees Ethics Act." 51 N.E.3d 69, 72 (Ill. App. Ct. 2016). In *Stover v. Louisville Metro Department of Public Health & Wellness,* the court affirmed the dismissal of the plaintiff's claim for wrongful discharge in violation of public policy where he was the requestor of records and not the designated custodian of records. No. 2018–CA–000054–MR, 2019 WL 258123, at *4 (Ky. Ct. App. Jan. 18, 2019). These cases actually cut against the majority's position. As in the cases cited by the majority, Carver-Kimm has asserted a statutory cause of action under the whistleblower statute, Iowa Code section 70A.28. There is no need for

this court to create an implied cause of action in addition to the enforcement mechanisms set forth in chapters 22, 23, and 70A.

In addition to being foreclosed by our precedents and contrary to persuasive authority, there are two additional reasons why this court should not imply a cause of action for wrongful discharge here. First, Carver-Kimm was not discharged. She resigned in lieu of termination. At best, her claim is one for wrongful constructive discharge rather than actual discharge. We have "never recognized a tort for wrongful discharge based on constructive discharge." *Strehlow v. Marshalltown Cmty. Sch. Dist.*, 275 F. Supp. 3d 1006, 1013 (S.D. Iowa 2017). We should not in this case open up this narrow tort to encompass conduct short of actual termination of employment.

Second, while the open records law "gives all persons the right to examine public records," the law also "lists specific categories of records that must be kept confidential by those responsible for keeping records." *ACLU of Iowa, Inc. v. Recs. Custodian, Atl. Cmty. Sch. Dist.*, 818 N.W.2d 231, 233 (Iowa 2012). Specifically, Iowa Code section 22.7 provides that "[t]he following public records shall be kept confidential, unless otherwise ordered by a court, by the lawful custodian of the records, or by another person duly authorized to release such information." In seventy-five separate subdivisions, the Code then lists all the categories of documents the lawful custodian must keep confidential. *See id.* § 22.7(1)–(75). The Code also provides a mechanism to protect these confidential records and enjoin disclosure. *Id.* § 22.8. Properly understood, the open records

law and its comprehensive remedial scheme balance two competing public interests: the desire for transparency and the necessity of confidentiality.

One of the ways the open records law balances these competing interests is through the delegation of responsibility and authority. Under chapter 22, the "lawful custodian" of a record is the "government body currently in physical possession of the public record." *Id.* § 22.1(2). The lawful custodian is authorized to "adopt and enforce reasonable rules regarding the examination and copying of the records" and "shall provide a suitable place for the examination and copying" of records. *Id.* § 22.3(1). Each government body "shall delegate to particular officials or employees of that government body the responsibility for implementing the requirements of [chapter 22] and shall publicly announce the particular officials or employees to whom responsibility" was delegated. *Id.* § 22.1(2). In implementing chapter 22, lawful custodians and their delegees must thread the needle between required disclosure and required confidentiality.

Allowing employees who are made aware of an open records request to unilaterally produce what documents they personally think should be produced—at the threat of suing the employer for wrongful discharge—destroys the statutorily-required delegation of responsibility and the statutorily-created balance between transparency and confidentiality. Consider the following hypothetical. A requestor files a request for certain public records. After legal review, the lawful custodian determines that the requested records contain "[p]ersonal information in confidential personnel records" and should not be produced. *Id.* § 22.7(11)(*a*). The delegee disagrees with the legal determination and produces

the requested records. Can the employer now lawfully discharge the employee? Not according to the majority. In the majority's view, the employee may have a cause of action against the employer. At minimum, according to the majority, the discharged employee could survive a motion to dismiss under our liberal pleading standards. Would the lawfulness of the discharge turn on whether that legal determination was correct? Does it matter who made the determination? Does good faith matter? The statute, as written, avoids these questions by creating two comprehensive remedies for the requestor to enforce the open records policy.

Or consider just the facts of this case as alleged in Carver-Kimm's petition. She alleges that she was the Iowa Department of Public Health's public information officer and then its communications director. She alleges that she was responsible for responding to open records requests "until March 2020." In her petition, she alleges that the defendants disallowed her from responding to open records requests. Relieving Carver-Kimm of this responsibility was statutorily permissible because it was and is the government body's statutory responsibility to designate those "particular officials or employees of that government body [with] the responsibility for implementing the requirements of [chapter 22]." *Id.* § 22.3(1). Carver-Kimm alleges that despite being told by her superiors that she no longer had the responsibility or authority to respond to open records requests for the lawful custodian, she went ahead and did so on her own initiative. She even alleges that she instructed certain news organizations on how to modify their requests so she could "immediately produce the emails." In sum, Carver-

Kimm alleges she resigned in lieu of termination after producing records she no longer had the statutory responsibility or authority to produce. The majority nonetheless concludes her suit should be allowed to proceed under our liberal pleading standards. Her suit evidences the disruption and imbalance an implied cause of action creates.

The implied cause of action for wrongful discharge in violation of public policy is narrowly circumscribed. Under our controlling precedents, this court only implies such a cause of action where it is necessary to enforce the public policy evidenced in the relevant statute. Where, as here, the statute evidencing the public policy contains its own enforcement regime, the implied cause of action is unnecessary and improper. Further, creating a wrongful discharge tort in this context undermines the balance the legislature struck in the statutory regime. Under the majority's rule, a lawful custodian of government records is deprived of true authority to manage the public records process. Now, lawful custodians must allow any employee to produce records, even when the employee has been relieved of the legal responsibility or authority to do so, and even when disclosure may be disallowed due to confidentiality, or face the threat of this court's newly created tort superadded to the legislature's already comprehensive enforcement scheme. For these reasons, I concur in part and dissent in part.

Oxley and May, JJ., join this concurrence in part and dissent in part.